588 F.2d 61
 18 Fair Empl.Prac.Cas. 1052
 Roscoe FRIEND and Theodore Fuller and Black Brothers
Combined of the City of Richmond, Inc., a Virginia
Corporation, Appellants,
v.
William LEIDINGER, Jack M. Fulton, Theodore Thornton and
John F. Finnegan, Jr., Individually and in their
official capacities, Appellees.
Roscoe FRIEND and Theodore Fuller and Black Brothers
Combined of the City of Richmond, Inc., a Virginia
Corporation, Appellants,
v.
The CITY OF RICHMOND, William Leidinger, Jack M. Fulton,
Theodore Thornton, John F. Finnegan, Jr.,
Individually and in their respective
capacities, Appellees.
 Nos. 77-2026, 77-2351.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1978.
Decided Nov. 29, 1978.
 
 1
 Anthony W. Robinson, Kenneth L. Johnson and Gerald G. Poindexter, Richmond, Va., for appellants.
 
 
 2
 Conrad B. Mattox, Jr., and James R. Saul, Richmond, Va., for appellees.
 
 
 3
 Before BUTZNER and HALL, Circuit Judges, and CHAPMAN, District Judge.*
 
 
 4
 CHAPMAN, District Judge.
 
 
 5
 The appellants are black fire fighters presently or formerly employed by the Richmond Fire Bureau. They instituted this class action pursuant to Title VII of the Civil Rights Act of 1964 (as amended in 1972 to cover governmental employers) complaining of racial discrimination in certain employment and promotional practices and procedures of the Bureau. A class was certified as being "Negroes who have, within the applicable period of the statute of limitations, been discriminated against with respect to employment practices by defendants and who (a) are presently employed in the Fire Department of the City of Richmond, or (b) formerly have been employed in the Fire Department of the City of Richmond."
 
 
 6
 The applicable period of the statute of limitations mentioned above is the 180 days established in 42 U.S.C. § 2000e-5(e), which requires that a charge under Title VII be filed with the Equal Employment Opportunity Commission within 180 days after the alleged unlawful employment practice occurred. The charge was filed with EEOC on November 11, 1974, so only those acts and practices which occurred on or after May 11, 1974 were considered by the district court.[1]
 
 
 7
 Plaintiff's complaints as to Bureau policies and practices alleged to be racially discriminatory were as follows:
 
 
 8
 (a) When making decisions on promotions and wage levels the Bureau's policy of considering the number of garnishments of a fireman's wages operated adversely to members of the black race;
 
 
 9
 (b) Blacks operating Bureau vehicles involved in traffic accidents were more frequently charged with causing such accident than were white employees and this adversely affected blacks in promotion;
 
 
 10
 (c) Testing procedures used by the Bureau for entry level and promotion were not sufficiently validated and job related and adversely affected black employees;
 
 
 11
 (d) The Bureau's practice of considering fitness ratings given by supervisors in determining promotions, which practice adversely affected blacks who usually received lower ratings than whites from their supervisors; and
 
 
 12
 (e) Black fire fighters were subjected to numerous incidents of harassment by white fire fighters and the Bureau leadership did nothing to prevent this harassment.
 
 
 13
 The case was tried by the district court, without a jury, and resulted in judgment in favor of the defendants. The record in the case is voluminous and the district court filed a very detailed 48 page opinion setting forth his findings of fact and conclusions of law.
 
 
 14
 The exceptions now on appeal relate to the failure of the district court to find racial discrimination as claimed in (a) through (e) above.
 
 
 15
 This was a bench trial and the district court had the opportunity to observe the witnesses, to weigh their testimony and to judge their credibility. The findings of fact by the trial judge are entitled to great weight and are not to be disturbed unless they are clearly erroneous. Due regard must be given to opportunity of the trial court to judge credibility. (Rule 52(a) FRCP). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[2]
 
 
 16
 After a careful review of the evidence underlying the trial judge's findings and conclusions this Court can not say that they are clearly erroneous and therefore we affirm.
 
 GARNISHMENT
 
 17
 The district judge summarized the evidence presented on the garnishment issue and concluded that in view of the small number of garnishments on which the statistical showing was based and particularly in view of the number of errors[3] in the plaintiff's exhibits, there was no proof that the Bureau's garnishment policy adversely affected blacks. There were 41 garnishments against the wages of black firemen between July 1972 and March 1977 and 20 of this number involved two individuals and at least two of these garnishments were counted twice in the exhibit.
 
 
 18
 The first time a garnishment is received by the Bureau, the fireman is counseled on his financial affairs. Subsequent garnishments result in a written reprimand, but there is no disciplinary action beyond the reprimand. The court found that there was no testimony that blacks had been penalized in pay or promotion because of the garnishment. There is considerable inconvenience and expense to the Bureau in handling the paper work, the withholding and the payment under garnishments and bad community relations are created when firemen fail to pay their just debts. The district judge found that failure to pay one's debts is evidence of irresponsibility and could be considered in determining promotion of firemen so long as this was not used as a pretext for racial discrimination. The court also found there was no racial discrimination in the Bureau's handling of garnishments and no violation of Title VII.
 
 
 19
 The district judge's findings on garnishment are amply supported by the record and plaintiff's position on the garnishment issue has been greatly weakened, if not destroyed, by the numerous errors contained in plaintiff's exhibits.
 
 VEHICULAR ACCIDENTS
 
 20
 There is a Fire Bureau Accident Review Committee charged with the responsibility of investigating traffic accidents involving fire equipment and determining whether the fireman driver should be "chargeable" therefor. Chargeable appears to be synonymous with negligence. Plaintiffs contend that between July 1, 1972 and March 1977 black fire fighters were involved in 22 vehicular accidents and were found chargeable by the Accident Review Committee in 76%, while during the same period white fire fighters were involved in 76 vehicular accidents and found chargeable in only 37%. Plaintiffs contend that this difference is statistically significant and adversely affects black promotion. They also assert under Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) that the Bureau has failed to show a business necessity for this difference in treatment before the Accident Review Committee.
 
 
 21
 The district court found that the sample size used in these comparisons was too small to give significant meaning to the conclusions drawn by the plaintiffs, but even if the statistics supported a finding of adverse impacts to blacks the defendants had met the burden of showing a compelling business necessity for the procedure.
 
 
 22
 The record amply supports the district judge's finding. Fire fighting equipment is very expensive and it is necessary for the Bureau not only to protect its equipment from damage due to the negligent operation by certain of its firemen, but also the Bureau has the responsibility to the public to see that such equipment is operated on busy city streets by careful and competent drivers. Accidents must be investigated and negligent drivers identified and transferred to other duties if the Bureau is to serve its proper function.
 
 
 23
 There has been no testimony that the Accident Review Committee is biased or prejudiced or does not properly investigate accidents and truthfully report its findings. Plaintiffs have not attempted to show that another system could serve the same purpose and eliminate an adverse impact.
 
 
 24
 TESTING PROCEDURES FOR ENTRY LEVEL AND PROMOTION
 
 
 25
 The district court found that 24.8% Of the employees of the Fire Bureau were black and that employees of the Bureau resided throughout the Richmond metropolitan area. In the Standard Metropolitan Statistical Area, which includes Richmond, the last census showed blacks to be 26.1% Of the population. Therefore, the percentage of blacks in the Fire Bureau is only 1.35% Less than that of blacks in the population. Plaintiffs complain that the percentage of black applicants eventually hired by the Bureau was only 18.6%, while the percent of white applicants hired was 32.1%. The trial court, however, found that the test (Fire Fighters B-1(M) developed by the International Personnel Management Association) used at the entry level was properly validated and job related. Although there was a dispute between the parties as to whether validation of the test should meet the EEOC guidelines or the guidelines prepared by the Federal Executive Agency on Employee Selection Procedures,[4] as adopted by the Justice Department, the trial court found the Department of Justice standards to be the most recent and reliable. Neither this Court nor the trial court must look solely to the EEOC guidelines particularly when the Department of Justice and a majority of other federal departments and agencies have adopted and use the more recent guidelines of Federal Executive Agency on Employee Selection Procedures.
 
 
 26
 The dispute in guidelines deals with whether Fire Fighter B-1(M) Test used by the Bureau had been properly validated. A part of the validation study was done in California and plaintiffs objected to a study not conducted in Richmond. However, plaintiffs have shown no difference in the duties of a fireman in the 55 areas of California, where the test was validated, from the duties of a Richmond fireman. To require local validation in every city, village and hamlet would be ludicrous.
 
 
 27
 There is ample testimony to support the trial judge's finding that the entry level test has been sufficiently validated and is job related. It is interesting to note that the city adopted a physical fitness test in addition to the B-1(M) Test and this physical condition test increased the percentage of blacks qualifying for employment.
 
 
 28
 The district court considered promotional tests during two time periods. It found no basis for liability as to any test given prior to May 11, 1974, the 180th day before the filing of the discrimination charge with EEOC since the complaints were not timely under Title VII. United Airlines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) and Hazelwood School Dist. v. U. S., 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) are authority for this ruling.
 
 
 29
 In the alternative the district court found that even if pre-May 11 test were reviewable, the statistical evidence of adverse impact was unpersuasive because of the small size of the sample used. Even considering all promotional tests during a ten year period preceding November 1975, only 24 blacks took the test. Plaintiff's expert witnesses admitted that the reliability of statistics was dependent upon the size of the sample, the larger the sample the greater the reliability of the findings and samples of under 30 should be avoided. It is not necessary for this Court to pass on the alternate ruling, since the trial judge was correct in his application of Evans and Hazelwood.
 
 
 30
 Only one set of promotional tests have been administered between the time Title VII was made applicable to governmental employers and the date of the trial. On November 1, 1975 such tests were given to personnel seeking promotion to the ranks of Battalion Chief, Deputy Battalion Chief, Fire Captain and Fire Lieutenant. No blacks took the Battalion Chief exam and only one took each of the tests for Deputy Battalion Chief and Fire Captain. The district court correctly ruled that the numbers were too small to draw any conclusions as to an adverse impact upon blacks.
 
 
 31
 A sufficient sample size did exist as to blacks seeking promotion to the rank of Fire Lieutenant. Such a promotion involves a two-step test. First, there is a written test and those passing go to the Assessment Center for an oral procedure. There were 67 black firemen and 209 white firemen tested for Fire Lieutenant and 3 blacks and 11 whites were promoted. Thus, 4.5% Of the blacks and 5.3% Of the whites tested were finally promoted. The plaintiffs contend that the written part of the test had an adverse impact upon blacks because only 20.9% Of the blacks passed and 35.9% Of the whites passed.
 
 
 32
 The district court correctly pointed out that the entire selection procedure and not just one segment must be considered. Of the 19 fire fighters certified as qualified by the Assessment Center 3 were black and 16 white. These names were submitted to the Fire Chief, who made the final selection of the 14 to be presented. Only 14 vacancies were available. The Chief promoted all three of the blacks and only 11 of the whites to Fire Lieutenant rank, which might indicate that this stage of the promotion procedure adversely impacted against whites. However, as the district court correctly observed, various subtests may not be analyzed in isolation as this can lead to inconsistencies. The best comparison is between the number of blacks and whites who initially sought promotion to Fire Lieutenant and the numbers who were actually promoted. Using this comparison the promotional procedure, taken as a whole, including the written test, the oral Assessment Center evaluation and the final selection by the Fire Chief demonstrated no adverse impact on blacks since 4.5% Of the Blacks and 5.3% Of the whites applying for promotion were successful.
 
 FITNESS RATINGS
 
 33
 The lower court was not persuaded by appellant's statistical showing that blacks received lower fitness ratings from their supervisors than whites. It was bothered by the fact that most blacks receiving such ratings were new recruits and were being compared with whites, who were experienced firemen. The ratings are given by each firemen's immediate supervisor and are to represent the supervisor's estimate of the fireman's performance during the period rated. These ratings are "unacceptable", "acceptable", "more than acceptable" and "outstanding".
 
 
 34
 Under the rating system set forth in General Order No. 80 of the Fire Chief on August 22, 1973, employees are to be compared to the job standards in determining fitness ratings and not with other employees. In fire fighting, experience is very important, and, as pointed out by the trial judge, a rookie fireman may be outstanding in comparison with other rookies but merely acceptable when measured against the job standards and an experienced fireman may be outstanding when measured against the job standard, but only average when measured against his peers on the force. In using figures that compared firemen with the same amount of seniority the court found that blacks receiving "more than acceptable" or better ratings was 94.5% Of the rate of whites receiving the same ratings and, therefore, there was no adverse impact for the group for which reliable and comparable statistics were available.
 
 HARASSMENT
 
 35
 In the fourth part of his opinion the district judge considered the affidavits of various black firemen as to instances of racial discrimination and harassment. The plaintiffs were given the opportunity of placing these witnesses on the stand for questioning and cross examination but preferred to use the affidavits, which procedure the court had approved. The district judge carefully considered each affidavit and found that most of the incidents complained of were normal gripes of employees against employers. Many of the complaints related to fitness ratings and promotions, but these did not state facts linking the complaints to racial discrimination.
 
 
 36
 The trial court found that some affiants had suffered harassment by white employees of the Bureau, but found that none of the named defendants were involved and that the defendants had taken corrective disciplinary action against white officers and employees who had harassed or discriminated against blacks. The incidents of racial discrimination against blacks were from fellow employees, had been isolated and contrary to Bureau policy, and the same had not been participated in or condoned by the Bureau or any of the defendants. The court found that these isolated incidents of racial tension did not constitute a violation of Title VII. More than 20 pages of the trial judge's order is devoted to a careful consideration of each of these affidavits, and his findings and conclusions are not clearly erroneous.
 
 
 37
 In all of its findings of fact the district court considered the City of Richmond Fire Bureau as a private employer and applied the law applicable to private employers under Title VII. It concluded there was no violation of Title VII under these principles. Then, as an additional ground for denial of relief, the court, citing the legislative history of the 1972 amendment to Title VII and numerous decisions thereunder, concluded that a state or subdivision thereof may be liable under Title VII only upon a showing of purposeful discrimination.
 
 
 38
 Since there are ample facts to support the district court's findings on the facts and legal conclusions applying the law of private employers to the Bureau, there is no reason for this Court to decide the question of purposeful discrimination and we will leave this for another day.
 
 
 39
 The decision of the district court is accordingly
 
 
 40
 AFFIRMED.
 
 
 41
 BUTZNER, Circuit Judge, concurring in part and dissenting in part:
 
 
 42
 I concur in affirming the parts of the district court's judgment that pertain to garnishments, traffic accidents, testing procedures, and fitness ratings. The judgments on these issues rest largely on the district court's findings of fact and assessments of credibility which are binding on us because they are not clearly erroneous.
 
 
 43
 I dissent from the affirmance of that part of the district court's judgment relating to harassment. On this issue I think the district court should be reversed and the case remanded for appropriate relief.
 
 
 44
 Section 703(a)(1) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)(1)) provides in pertinent part:
 
 
 45
 It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . .
 
 
 46
 Congress adopted the language concerning terms, conditions, or privileges of employment to assure that Title VII would reach more than hiring, promotion, and firing. This statute is "an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971). Professor Larson explains in 3 Employment Discrimination § 84.10 (1977):
 
 
 47
 Although few such cases appear to have arisen in recent years, it is clear from the earlier cases raising the point that this language forbids such conduct as the practice of supervisors calling black employees "Niggers," of the employers' tolerating ethnic jokes, and of employers' requiring that black employees be addressed in less respectful terms than white . . . .
 
 
 48
 The EEOC has taken the position in these kinds of cases that there is a positive duty on the employer to maintain an environment free of this kind of racial harassment and intimidation. Thus, if the employer is aware that ethnic jokes are being told by coemployees (not merely by supervisors), and that insulting remarks are being scribbled on restroom walls, he has an obligation to investigate, and to punish the offenders, if necessary to eradicate the practice.
 
 
 49
 The evidence discloses numerous instances of racism that violate § 703(a)(1). These incidents fall into four categories. First, some officers of the bureau express their racial bias by using epithets such as "niggers," "nigras," or "spear chunkers" to refer to black firemen; by referring to a black residential section of Richmond as the "Congo;" and by stating that black firemen are not qualified to assume greater responsibility in the bureau. Second, officers ignore or acquiesce in the hazing of black firemen by white firemen. Third, eating and sleeping facilities are segregated in some of the fire stations. Fourth, without justification, white firemen sometimes receive better treatment in the form of more lenient discipline or better training opportunities than similarly situated blacks.
 
 
 50
 The district court denied relief with respect to this aspect of the case for a number of reasons, which are set forth in Friend v. Leidinger, 446 F.Supp. 361, 375-84 (E.D.Va.1977). Generally, it found that there was no causal relationship between the conduct of the white officers or firemen and the race of the complaining firemen. For example, the court dismissed the claim that a captain ignored a complaint of hazing because the testimony did not show whether similar complaints against white firemen were also ignored. The evidence, however, showed no similar harassment of white firemen. The court therefore placed an impossible burden on the black complainants.
 
 
 51
 On the basis of the bureau chief's testimony that his batallion officers had assured him that there was no segregation in eating or sleeping facilities, the district court dismissed the claims of five firemen that such segregation existed. The batallion officers were not called to refute the complainants' testimony. The chief's testimony provided an unsubstantial basis for the court's ruling because he lacked personal knowledge of the controversy.
 
 
 52
 The district court also denied relief on the ground that the black firemen had not carried their complaints to the chief of the bureau. The futility of this course of action, however, is attested by the chief's response to the humiliation of a black fireman who was harassed by having a simulated hog trough placed before him at the dinner table. When the black fireman offered to fight the person responsible, his station captain reported him to the chief. The chief required him to apologize, under threat of discharge, to the white firemen. In the presence of the chief, he did so, while the white firemen ridiculed him.
 
 
 53
 Although the court found that white officers and firemen had harassed black employees and had discriminated against them, it denied relief because it considered the incidents to be isolated, contrary to bureau policy, and without authorization or acquiescence of the named defendants. Apart from the erroneous factual basis for this ruling, the district court misapprehended the law.
 
 
 54
 Congress intended to prevent employers from thwarting the Act merely by disavowing the racism of their middle-level supervisors. Section 701(b) (42 U.S.C. § 2000e(b)) includes any agent of an employer within the statutory definition of an employer. Therefore, the bureau is answerable under Title VII for discriminatory conduct by its officers acting within the purview of their authority. See Anderson v. Methodist Evangelical Hospital, Inc., 464 F.2d 723, 725 (6th Cir. 1972); 3 Larson, Employment Discrimination § 84.10 (1977).
 
 
 55
 I would remand the case for the entry of an order requiring the officials in charge of the fire bureau to promulgate regulations forbidding racial discrimination and harassment by its officers and employees, to provide means of enforcement, and to punish violators.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 Hazelwood School Dist. v. U. S., 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)
 
 
 [2]
 U. S. v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1947)
 
 
 [3]
 When these errors became obvious at trial, plaintiffs made no effort to correct or explain them. The trial court observed that if the errors in plaintiffs' exhibits had not been discovered, the Court would have been misled
 
 
 [4]
 A strange result
 EEOC does not use the new guidelines even though its chairman was one of the group of five that wrote these new guidelines.