Frank BROWN, Jr. et al.

v.

The NEW HAVEN CIVIL SERVICE BOARD et al.

Civ. No. N–78–234.

United States District Court,
D. Connecticut.

July 27, 1979.

Clarance J. Jones, Center for Advocacy, Research & Planning, Inc., New Haven, Conn., for plaintiffs.

Joseph D. Garrison, Sp. Asst. Corp. Counsel, New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NEWMAN, Circuit Judge.*

The three plaintiffs, Black citizens of Connecticut, have brought this suit alleging racial discrimination in testing and hiring for the New Haven police force during 1978. The basic claim is that a written examination administered in February, 1978, to applicants for the police force had a disproportionate impact upon Blacks that cannot be justified by job-relatedness. The defendants respond that the percentage of Blacks hired by the New Haven Police Department, as the end result of selection procedures of which the written exam was only one part, was substantially proportionate to the percentage of eligible Blacks living in New Haven. Relying on this argument, the defendants have moved for summary judgment.

The process by which hiring decisions were made in 1978 consisted of several stages. After filling out an application

form, an applicant was eligible to take a written examination. Anyone who took the written exam was eligible in turn to take a physical agility test. The written exam and physical agility test were scored separately, and the scores were combined to determine whether an applicant had passed or failed. Those who accumulated a combined score over a minimum passing grade became eligible for an interview. The interviews were scored separately, and applicants scoring highest in the interviews were hired. No quotas or goals for different racial groups were established, but the reasonable inference is that in assessing the interview candidates, the city officials made some conscious effort to rate minority candidates sufficiently favorably to produce hiring results roughly proportionate to New Haven's minority population.

The three plaintiffs allege that they all failed the written exam administered in February, 1978. Since a separate passing score for the written exam was never established, the plaintiffs apparently mean that they failed to accumulate a combined passing score for the written exam and physical agility test because of their low scores on the written exam. They filed charges with the U.S. Equal Employment Opportunity Commission (E.E.O.C.), and plaintiffs Brown and Nobles have received right to sue letters, thereby satisfying jurisdictional prerequisites to pursuing their Title VII claims here. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798–99, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff Campbell has not received a right to sue letter, but she makes the same claims under 42 U.S.C. § 1981 as she does under Title VII, and § 1981 claims are not subject to a requirement of resort to Title VII's administrative machinery. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460–61, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).[1]

* Of the United States Court of Appeals for the Second Circuit, sitting by designation. At the time this motion was submitted for decision, Judge Newman was a District Judge of the United States District Court for the District of Connecticut.

1. Campbell alone makes the constitutional claim that a residency requirement for employment on the New Haven police force violated her right to travel. This constitutional claim need not follow administrative channels before coming to this Court. *See Wright v. City of*

The plaintiffs claim, in the first count of their amended complaint, that the written exam was racially discriminatory in its effect and was not job-related, and that their exclusion from consideration for hiring because they failed the exam violated their rights to equal employment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2 *et seq.* The same allegations form the basis of the second count, claiming a violation of 42 U.S.C. §§ 1981 and 1983. Claiming that the defendant members of the New Haven Civil Service Board knew or should have known in advance that the written exam was culturally biased and not job-related, the plaintiffs claim in the third count that the intentional administration of the test violated their rights under the Fourteenth Amendment and 42 U.S.C. §§ 1981 and 1983. The fourth count claims a violation of the constitutional right to travel and guarantee of equal protection of plaintiff Millicent Campbell, the only one of the three plaintiffs who lives outside New Haven, in the adjacent town of West Haven. The fifth count presents a claim of violation of Conn. Gen.Stat. §§ 7–409 and 7–413 and a related rule of the New Haven Civil Service Commission, providing that public employees should be selected on the basis of ability and that tests should relate to applicants'

abilities to perform the jobs for which they are applying. The sixth count claims a violation of the equal protection provision of the Connecticut Constitution, Art. I §§ 1 and 20. In the seventh and eighth counts, plaintiffs claim violations of racial discrimination prohibitions in two statutes under which New Haven receives federal money, 42 U.S.C. § 3766(c) (Law Enforcement Assistance Administration) and 31 U.S.C. § 1242 (Office of Revenue Sharing of U.S. Department of the Treasury). Finally, in the ninth count there is a claim of violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibiting racial discrimination in any program receiving federal financial assistance, and pertinent federal regulations thereunder, including 28 C.F.R. § 42.201 *et seq.*

■■■ The statutory claim under Title VII will be considered first. See *New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). The test being challenged is facially neutral, but in a case of alleged disproportionate impact upon a racial minority, a discriminatory effect violates Title VII even in the absence of an intent to discriminate.[2] See *Dothard v. Rawlinson,* 433 U.S. 321, 328–29, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977);

---

*Jackson, Mississippi,* 506 F.2d 900 (5th Cir. 1975).

**2.** Plaintiffs argue that their Title VII claims should be analyzed according to the standards of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a "disparate treatment" case in which an individual alleged that an employer had treated him less favorably than others because of his race. But the plaintiffs' challenge to the facially neutral test used as an employment qualification places their claim in the line of *Griggs* and *Albemarle. Rule v. Ironworkers Local 396,* 568 F.2d 558, 566 (8th Cir. 1977); cf. *Furnco Construction Co. v. Waters,* 438 U.S. 567, 575 n. 7, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). If the *McDonnell Douglas* analysis were applied, plaintiffs would have to prove discriminatory motive as part of their disparate treatment claim. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Proof of discriminatory motive is not required in a "disparate impact" case. *Id.* at 336 n. 15, 97 S.Ct.

1843; *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Nor do the claims in this case raise issues about a "pattern or practice" of disparate treatment. Cf. *International Brotherhood of Teamsters v. United States, supra.* In their amended complaint, the plaintiffs added to the "factual background" section an allegation that "the defendants have a history and pattern and practice of discriminating against black persons . . . ." They also allege that an employment test given in December, 1975, had a disproportionate impact on Blacks. Their claims, however, focus on the effects of the employment test administered in February, 1978. The plaintiffs do not base their suit on a theory that there was a decision not to hire them because they are Black; rather, they attack the effects of one test. These plaintiffs cannot even claim that the defendants had a practice of using discriminatory tests. All three of the plaintiffs took the written test administered in December, 1975, and two of them passed.

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). To prove their Title VII claim, plaintiffs must first establish a *prima facie* case of discrimination. According to guidelines adopted by the E.E.O.C. and other enforcement agencies, a *prima facie* case of discrimination is established when the selection rate for members of any race or ethnic group is less than 80 per cent of the rate for members of the most successful race or ethnic group. Uniform Guidelines on Employee Selection Procedures, 43 Fed.Reg. 38290 (Aug. 25, 1978). While this "four-fifths rule" is not binding on courts, it is an administrative interpretation entitled to considerable deference. See *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 431, 95 S.Ct. 2362; *Griggs v. Duke Power Co., supra*, 401 U.S. at 433–34, 91 S.Ct. 849, 28 L.Ed.2d 158.

If the allegations of the amended complaint are accepted for purposes of defendants' motion for summary judgment, the passing rates on the written examination establish a *prima facie* case of adverse impact. Plaintiffs allege that of 99 Blacks who took the written exam, 30 passed; of 194 Whites who took the exam, 120 passed. The passing rate for Blacks, 30.3%, was less than half of the passing rate for White, 61.9%.[3]

■ The ultimate results of the entire hiring process, however, show that no *prima facie* case of adverse impact is established. The number of Blacks hired as a percentage of the Black applicants is roughly the same as that for Whites. If an "applicant" is defined as a person who completely filled out an application form, 184 Blacks and 334 Whites applied, of whom 14 Blacks (7.6%) and 30 Whites (9.0%) were hired. Alternatively, if an "applicant" is one who took the written exam, 175 Blacks and 316 Whites applied; the hiring percentages on this basis are 8.0% for Blacks and 9.5% for Whites. Under either definition of "applicant" the ratio of the hiring rate for Blacks compared to that of Whites is 84%, satisfying the E.E.O.C. 80% guideline.[4] Moreover the

---

3. After oral argument, the plaintiffs submitted statistics obtained from the New Haven Police Department, which can be interpreted in a number of different ways. The new documents indicate that 123 Blacks took the written exam, of whom 28 (22.8%) passed *both* that exam and the subsequent physical agility test. The combined-test pass-rate is a function of the method of administering and scoring the two tests: anyone who took the written exam was eligible to take the physical agility test, and the two exams were scored together, so that no figures are available to show the pass-rate for the written exam alone. (The plaintiffs do not explain how they derived the figures in the complaint.) On the same basis, of 233 Whites who took the written exam, 119 (53.4%) passed both that exam and the physical agility test. Because fewer applicants took the physical agility test, administered after the written exam, than were eligible, a third set of pass-rates can be derived. Of 100 Blacks who took the written exam and the physical agility test, 28 (28%) passed both; of 193 Whites, 119 (61.7%) passed both.

No matter which set of figures is used, the pass-rate for Blacks is less than half that for Whites. Where statistics reflect passing scores for the combined written and physical exams, the defendants do not attribute any adverse effect to the physical agility exam. To the contrary, they claim that the physical agility exam would, if anything, disproportionately benefit the Black applicants. Thus, even on the basis of the combined statistics, the plaintiffs' claim focuses on the written exam.

4. A third definition construes "applicant" as anyone who simply picked up an application. On that basis, 301 Blacks and 431 Whites applied, and 4.7% of the Blacks were hired, as compared with 7.0% of the Whites. The rate of selection of Blacks under this calculation is only 67% of the rate of selection of Whites, thereby indicating "adverse impact" under the four-fifths rule. These figures could be skewed by affirmative efforts to encourage Blacks to apply for the police department, creating a disproportionately high number of Black applicants under this definition. On the other hand, it could be argued that disproportionately fewer Blacks filled out applications, after picking them up, because a mere reading of the qualifications for the job discouraged them and discriminated against them in a subtle manner. *Cf. Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (published height requirement). Both arguments only show the difficulty of relying on statistics based on number of "applicants," however defined. There is no indication that any calculations based on applicants more accurately reflect the "true" applicant *pool* than statistics concerning the general population.

number of Blacks hired (14) as a percentage of the total number of police officers hired (50) [5] is 28%, a figure roughly comparable to the 26% Black percentage in the New Haven population, according to the 1970 census.[6] See *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission*, 354 F.Supp. 778, 785 (D.Conn.), *aff'd in part*, 482 F.2d 1333 (2d Cir. 1973).[7]

■ Thus, the precise issue in this case is whether the plaintiffs can make the required *prima facie* showing in their Title VII case by claiming the disproportionate impact of a written exam that forms one part of a hiring process, when the defendants show that the total hiring process resulted in no disproportionate impact according to comparisons of racial hiring percentages against either total applicants or general population. In other words, are the plaintiffs entitled to penetrate the total hiring process and challenge a particular component, the written exam?

Of the few courts that have considered the issue, the majority have held that the selection process as a whole, rather than any segment of it, should be examined for disproportionate impact in a Title VII case. *Friend v. Leidinger*, 588 F.2d 61, 66 (4th Cir. 1978), *aff'g* 446 F.Supp. 361 (E.D.Va. 1977); *Rule v. Ironworkers Local 396*, 568 F.2d 558, 565 n. 10 (8th Cir. 1977); *Smith v. Troyan*, 520 F.2d 492, 497–98 (6th Cir. 1975); *Lee v. City of Richmond*, 456 F.Supp. 756, 771 (E.D.Va.1978); *cf. Kirkland v. New York State Department of Correctional Services*, 374 F.Supp. 1361, 1370 (S.D.N.Y.1974), *aff'd in relevant part*, 520 F.2d 420, 425 (2d Cir. 1975) (showing that overall examination procedure has disparate results cannot be rebutted by fragmenting process and showing no disparate results in separate parts); *Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission*, 360 F.Supp. 1265, 1272 (S.D.N.Y.), *aff'd*, 490 F.2d 387 (2d Cir. 1973) (same). *Contra, Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1372–73 (5th Cir. 1974); *League of United Latin American Citizens v. City of Santa Ana*, 410 F.Supp. 873, 894–95 (C.D.Cal.1976).

5. Plaintiffs argue that the analysis of the 1978 hiring process in the New Haven Police Department should be based on a total of 57 newly hired police officers. The difference between the two sets of statistics is attributable to the promotion of seven part-time officers to full-time status, on the basis of their performance on the job rather than on the hiring test administered in February, 1978. Plaintiffs reason that since the "overall hiring process" yielded 57 new full- and part-time officers, an analysis of the entire process (as the defendants urge) should be based on the total number of newly hired officers. However, the issue in the case is the manner in which the police department hired on the basis of a process of examination and selection of new personnel during 1978; promotions of officers hired on the basis of previous hiring processes are irrelevant to this question. The police department filled fifty positions on the basis of the hiring procedure that included the disputed February, 1978 exam.

If the 1978 hiring process were analyzed as the plaintiffs urge, the proportion of Blacks hired would drop and the proportion of Whites would rise, but in neither case by a significant percentage. Since the seven part-time police officers promoted without administration of the 1978 exam were all White, 37 of 57 positions (64.9%) were held by Whites, and 14 of 57 (24.6%) by Blacks.

6. According to an affidavit submitted by the defendants, calculations based on 1970 census information show that the New Haven population between the ages of 18 and 64 is approximately 22% Black. The affiant has not calculated the percentage of Whites in the same population.

Of the 11 full-time positions filled on the basis of the 1978 hiring procedure, 6 were filled by Blacks and 4 by Whites; in addition, 7 White part-time officers were promoted to full-time positions, as explained above. The 39 part-time positions were filled by 8 Blacks and 26 Whites (and 5 Spanish-surnamed applicants). Currently, 14 of the 39 part-time officers are working full-time, including 3 Blacks and 8 Whites.

7. Statistics comparing the percentage of minority hires with the minority percentage of the population in a relevant geographical area can establish a *prima facie* case of discrimination. *Green v. Missouri Pacific Railroad*, 523 F.2d 1290 (8th Cir. 1975); *League of United Latin American Citizens v. City of Santa Ana*, 410 F.Supp. 873, 891 (C.D.Cal.1976); *cf. Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission*, 482 F.2d 1333, 1335 n. 4 (2d Cir. 1973).

The plaintiffs distinguish *Smith v. Troyan*,[8] *supra*, by pointing out that the written exam there was part of a cumulative application process. The written exam here, by contrast, combined with the physical exam, was a pass-fail hurdle that could prevent an applicant from entering the pool from which hiring decisions were made on the basis of interviews. *Cf. League of United Latin American Citizens v. City of Santa Ana, supra*, 410 F.Supp. at 894. But this distinction has no effect on the analysis of the problem presented. Even in a cumulatively scored application process, a score on any single component might be so low as to preclude the accumulation of a total score meeting a minimum hiring requirement, *cf. United States v. City of Buffalo*, 457 F.Supp. 612, 622 (W.D.N.Y.1978), or a total score at least equal to that of the lowest scoring applicant who was hired. The fact that test scores are cumulated in an application process would not itself prevent scrutiny of a component, if that type of investigation were legally required.

To examine each component of an entire application process, however, launches a court on a course that has no boundaries and no clear end. In *Smith v. Troyan, supra*, unsuccessful applicants to the East Cleveland police force challenged a "subtest" in the process of hiring. The court recognized that the same type of challenge could be made of any subtest segment of a subtest, and that at its extreme that theory of Title VII "would require the elimination of individual questions marked by poorer performance by a racial group . . . ." 520 F.2d at 498.

Presumably, even courts that have penetrated an application process to examine a component of it would draw the line at some point, to avoid scrutiny of every question of every test in a hiring procedure. Such particularized judicial review would create obvious problems of court management and administration. Moreover, a test used in evaluating applicants might be found valid despite the disproportionate effect on a minority group of a single question that was not job-related. *Cf. Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506, 514 (8th Cir. 1977). Yet even if only one question has a disproportionate impact on a minority group, an individual who answers that question incorrectly and then fails by one point to accumulate the minimum required score for hiring can argue that he has been the victim of discrimination in the hiring process. The prospect of a court's examining subtests, sub-subtests, and even individual questions within test segments argues in favor of examining only the end result of an entire hiring process.[9]

Although Title VII does not require employers to hire minority groups in proportion to their representation in the population, see 42 U.S.C. § 2000e–2(j), the ordinary expectation is that "nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). A proportionately balanced work force normally reflects nondiscriminatory

8. The claim of discrimination in *Smith* was made on constitutional grounds; claims based on Title VII were "[n]oteworthily absent." *Smith v. Troyan*, 520 F.2d 492, 493 n. 3 (6th Cir. 1975). The Court correctly recognized that the requirements imposed by Title VII might differ from those of the Equal Protection Clause, *ibid.*; *see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), but its holding concerning "subtests" concluded an inquiry into the *prima facie* demonstration of unlawful discrimination. The special constitutional requirement of discriminatory motive in an equal protection claim, *see id.* at 239, 96 S.Ct. 2040, thus played no part in the analysis. The Court's questions tracked those of a Title VII case, and the holding is applicable here.

9. Once an overall hiring process has been found to discriminate, a court may examine the process to isolate components as the particular causes for that total unlawful effect. *See Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission*, 354 F.Supp. 778, 794 (D.Conn.), *aff'd in part*, 482 F.2d 1333 (2d Cir. 1973).

hiring practices, just as longstanding and gross disparity may be significant in indicating discriminatory hiring practices. *Ibid.* Possibly, disparities in a particular process of hiring could result from the statistical risks of disproportionate results that accompany even nondiscriminatory tests. Conversely, a proportionately balanced work force could result from a hiring procedure consisting of several components having disproportionate but off-setting effects on different groups. See *Friend v. Leidinger,* 446 F.Supp. 361, 372 (E.D.Va.1977), *aff'd,* 588 F.2d 61 (4th Cir. 1978). In *Friend* itself, however, that recognition was not enough to persuade the Court to go beyond the balanced results of the overall hiring process and examine a particular test that was a pass-fail hurdle and had a disproportionate effect on Blacks.

As Congress and the Executive Branch try to develop affirmative action programs within constitutional limits to redress the deprivations minorities have endured, see *Fullilove v. Kreps,* 584 F.2d 600 (2d Cir. 1978), *cert. granted,* —— U.S. ——, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979), and as private parties are permitted under Title VII itself to adopt voluntary affirmative action plans, see *United Steelworkers v. Weber,* —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), Title VII should not be needlessly construed to prohibit the action challenged here. Specifically, Title VII should not be construed to prohibit a municipality's using a hiring process that results in a percentage of minority policemen approximating their percentage of the local population, instead of relying on the expectation that a validated job-related testing procedure will produce an equivalent result, yet with the risk that it might lead to substantially less minority hiring.[10]

It may be that *intentional* use of components having a disproportionate effect on minority groups could establish a *prima facie* case of violation of Title VII, even if the total hiring process results in balanced results. The latitude afforded municipalities to increase minority hiring assumes a good faith effort to undo the effects of past discrimination; evidence showing racial animus and an intent to distort the hiring process would negate that assumption and justify investigation into discriminatory components. Plaintiffs attempt to show discriminatory intent by referring to minutes of a New Haven Civil Service Board Meeting, held on January 13, 1978, at which the proposed written exam was discussed. A consultant selected by the Board stated that "it would be difficult to base a decision for selecting police officers on this type of exam." One of the Board members asked "whether certain items on the test thought to be 'culturally biased' could be eliminated," and the consultant answered that they could not. The Board nevertheless decided to proceed with the use of the exam.

■ The minutes of the meeting do not establish an intent to discriminate. Even resolving ambiguities most favorably to plaintiffs, by imputing to the Board knowledge that certain questions would in fact have a disproportionate impact on Blacks, would not prove discriminatory intent, since a test can be valid despite defective individual questions. See text at page 1262, *supra.*

■ The plaintiffs have thus failed to put in issue facts that justify penetrating beyond the racially neutral results of the hiring process, and have thus failed to make the *prima facie* showing required by Title VII.

Discrimination claims made under the revenue sharing statute, 31 U.S.C. § 1242, are governed by Title VII standards. *United States v. City of Chicago,* 549 F.2d 415, 439–40 (7th Cir. 1977); *United States v.*

---

**10.** The E.E.O.C. and other federal enforcement agencies have also adopted a "bottom-line" approach in deciding when to bring action against employers. *See* Uniform Guidelines on Employee Selection Procedures, 43 Fed.Reg. 38290, 38291, 38293 (Aug. 25, 1978). This policy controls the exercise of prosecutorial discretion; but in allocating resources of government agencies, it also indicates a threshold of administrative concern about different hiring practices. At least in the absence of discriminatory intent, the threshold of judicial inquiry should be set at the same level.

*City of Buffalo, supra,* 457 F.Supp. at 619. Claims of racial discrimination in a program receiving funds from the Law Enforcement Assistance Administration, under 42 U.S.C. § 3766(c), are subject to the same analysis. *See United States v. Virginia,* 454 F.Supp. 1077, 1082–85 (E.D.Va.1978).[11] The prohibitions of 42 U.S.C. § 1981 bar discrimination in employment, *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), and provide the same protections as Title VII. *Carrion v. Yeshiva University,* 535 F.2d 722, 729 (2d Cir. 1976). Specifically, § 1981 claims of discriminatory impact in hiring procedures are tested by Title VII principles.[12] *Davis v. County of Los Angeles,* 566 F.2d 1334, 1340 (9th Cir. 1977), *vacated as moot,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); and cases cited therein. The plaintiffs' claims based on these different statutes therefore fail for the reasons set forth above.

■ However much debate there has been as to whether individuals can bring suit under Title VI, compare, *e. g., Regents of the University of California v. Bakke,* 438 U.S. 265, 379–87, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of White, J.), with *id.* at 418–21, 98 S.Ct. 2733 (opinion of Stevens, J.), the Supreme Court has recently concluded that Title VI authorizes an implied private cause of action for victims of the discrimination prohibited by that statute. *Cannon v. University of Chicago,* —— U.S. ——, —— – ——, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The Supreme Court has also held that Title VI incorporates a constitutional standard and "proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the

Fifth Amendment." *Regents v. Bakke, supra,* 438 U.S. at 284–87, 98 S.Ct. at 2747 (opinion of Powell, J.), 328–40 (opinion of Brennan, White, Marshall, and Blackmun, JJ.). A claim of unconstitutional racial discrimination in employment procedures requires proof of discriminatory intent. *Washinbton v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). As discussed previously, the only allegations of such intent in this case do not establish a racially discriminatory purpose. The plaintiffs' Title VI and constitutional claims must therefore be rejected.

■ Plaintiff Campbell claims that the residency requirement for the New Haven police force violates her constitutional right to travel. Although *durational* residency requirements have been struck down when not supported by compelling state interests, *e. g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the Supreme Court has held explicitly that there is no constitutional right to be employed by a city *while* a person is living elsewhere. *McCarthy v. Philadelphia Civil Service Commission,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976) (*per curiam*). *McCarthy* involved the right of interstate travel, but the holding that the Philadelphia residency requirement did not violate that specifically recognized fundamental right applies *a fortiori* to a case involving intrastate travel, which does not rise to the same level of constitutional importance. See *Andre v. Board of Trustees,* 561 F.2d 48 (7th Cir. 1977); *Wardwell v. Board of Education,* 529 F.2d 625 (6th Cir. 1976); *Wright v. City of Jackson, Mississippi,* 506 F.2d 900 (5th Cir. 1975).

---

11. The court in *Virginia* rejected the argument that purposeful discrimination must be proved in a suit brought under § 3766(c), as it must in an equal protection case. Obviously, adoption of the more exacting constitutional standard would only add another obstacle to the claims made by the plaintiffs here.

12. Section 1981 is not coextensive in its coverage with Title VII. The latter is made inapplicable to certain employers. . . . Also, Title VII offers assistance in investigation, conciliation, counsel, waiver of court costs, and attorneys' fees, items that are unavaila-

ble at least under the specific terms of § 1981.

*Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). More extensive back-pay awards and other monetary relief are available under § 1981 than under Title VII, and resort to Title VII's administrative machinery is not a prerequisite to the institution of a § 1981 action. *Ibid.* But these differences in procedures and remedies do not affect the similarity of analyses to establish violations of the two statutes.

Plaintiff Campbell's claims regarding her right to travel are without merit.

The disposition of the federal statutory and constitutional claims leaves no basis for a claim based on 42 U.S.C. § 1983. *Cf. Chapman v. Houston Welfare Rights Organization*, —— U.S. ——, ——, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

Pendent jurisdiction over state law claims obviously depends on the existence of some federal claims in the case. Since all federal claims fail at the outset, the pendent claims will be dismissed, without prejudice. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Fur Information & Fashion Council, Inc. v. E. F. Timme & Son, Inc.*, 501 F.2d 1048, 1055 (2d Cir. 1974); *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176, 1179 (2d Cir. 1974). No special circumstances militate in favor of retaining jurisdiction over the questions of state law presented.

Defendants' motion for summary judgment is granted. Judgment may enter for the defendants.