Lynda LeBoeuf COSTA,
Plaintiff-Appellee,

v.

John A. MARKEY, et al.,
Defendants-Appellants.

No. 81–1361.

United States Court of Appeals,
First Circuit.

Argued March 1, 1982.

Decided May 3, 1982.

Armand Fernandes, Jr., New Bedford,
for defendants-appellants.

Thomas F. McKenna, with whom Mariann Zampano, Boston, Mass., was on brief, for plaintiff-appellee.

Thomas A. Barnico, Asst. Atty. Gen., Boston, Mass., Government Bureau, Dept. of the Atty. Gen., with whom Francis X. Bellotti, Atty. Gen. and Betty E. Waxman, Asst. Atty. Gen., Boston, Mass., Government Bureau, Dept. of the Atty. Gen., were on brief, for the State appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

The interesting question at the heart of this appeal is whether the authorities of New Bedford engaged in sex discrimination when they hired police officers from an all-women pool from which the female plaintiff was excluded because she was below the required minimum height of 5 feet, 6 inches.

Plaintiff's action was brought against the mayor, chief of police, and city councillors of New Bedford and the personnel administrator and Civil Service Commission of the Commonwealth of Massachusetts. The district court denied relief sought under 42 U.S.C. §§ 1981, 1983, and the Equal Protection clause of the Fourteenth Amendment, but granted retroactive relief in the form of back pay and other benefits for the city's violation of section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. The city challenges both the finding of discrimination and the conclusion that the Commonwealth defendants were

not jointly and/or severally liable with the city defendants.[1]

The presently critical facts are few. In 1974 New Bedford abolished its separate hiring procedures for "policewomen" and "police officer" and used an "integrated" candidate list for "police officer" prepared by state civil service. Early in that year, a recently adopted 5 feet, 6 inches height requirement was extended to apply to women as well as to men. Plaintiff, 33 years old and 5 feet, 3 inches tall, took her police civil service examination in 1972, was notified in 1973 that her score was 93.3 per cent, and in May, 1974, passed the city's physical fitness examination. On July 30, 1974, the use of an integrated list of men and women, ranked by civil service to reflect examination scores and statutory and court ordered preferences, failed to result in the appointment of any female.[2]

New Bedford, having a continuing need for a female police officer, *e.g.*, to attend to female prisoners and to investigate cases involving females, sought and received permission from the Massachusetts Commission Against Discrimination to make a gender-specific hiring. To implement this action, it also received, on August 12, an all-women list. Plaintiff, although placing first on the list, was rejected because of her height. All height requirements were abolished in November, 1974. The evidence before the court, in addition to these facts, included national statistics showing that as of 1960–1962 80 per cent of women between 18 and 34 were shorter than 5 feet, 6 inches, and that as of 1971–1974 the average height of women between the ages of 25 and 34 was 5 feet, 4.1 inches while that for men in the same age bracket was 5 feet, 9.6 inches.

The district court specifically found that the height requirement had not been adopted "because of" a purpose to discriminate against women. It therefore addressed the Title VII issue as one involving a presumptively neutral test which results in a disparate impact, without requiring proof of a discriminatory purpose. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). The court found that plaintiff's statistics established "the significantly disparate impact of a 5 feet 6 inches minimum height requirement upon women as compared to men." This, so the court concluded, made out plaintiff's prima facie case which was unrebutted. The court therefore found the height requirement invalid because it was "so intimately and integrally related to the broader use of the height requirement" and because "but for application of the height requirement to the selection from the all-women list, plaintiff would have been on the police force under a valid appointment."

The precise issue before us is whether the district court was correct in concluding that plaintiff had established a prima facie case under the statute. The statute, 42 U.S.C. § 2000e–2(a), states, in essence, that it is an unlawful practice for an employer "(1) to ... refuse to hire ... any individual ... because of such individual's ... sex ...; or (2) to ... classify ... applicants for employment in any way which would deprive ... any individual of employment opportunities ... because of such individual's ... sex ...." A prima facie disparate impact case under the statute requires a demonstration by plaintiff that the employee selection restriction selects "applicants for hire ... in a [sexual]

---

1. The plaintiff presently serves on the police force with seniority and pay calculated in accordance with the district court's finding that she had been improperly deprived of employment at the time of the hiring from the height-restrictive all-women pool. In the event this court finds no violation of Title VII, plaintiff is to retain her position but her pay and seniority are to be calculated on the basis of the date of her actual appointment.

2. This end result followed a drama, if not a comedy, of errors in which, first, plaintiff's name was erroneously left off the list, second, her name was restored to the list at an erroneously higher position than her various qualifications merited, and, third, after an interview (which she should not have had) she was rejected because of failure to meet the height requirement. The district court's ruling that this rejection did not cause cognizable harm because any appointment of plaintiff would have been invalid, is not contested.

pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425, 95 S.Ct. at 2375.

Defendants argue in essence that plaintiff was excluded, not because she is a woman but because she is short. The criterion of height, of course, does operate to exclude more women than men when the two sexes are in competition. It is then a built-in trigger of discrimination. But, they contend, the fact that the pool of applicants is limited to women operates as a safety lock, preventing the trigger from achieving its ordinarily discriminatory end result. The end result here, the filling of the two available job openings from the August 12 list with women only, cannot be said to produce a sexual pattern significantly less representative of women than is the pool of persons interested in joining the New Bedford police force. Thus, say defendants, plaintiff has not established a prima facie case. Plaintiff finds this analysis simplistic. She emphasizes the fact that she, an individual woman, never had a chance to compete because of a pass-fail threshold height requirement that is more adverse in its impact on women than it is on men.

In assessing these positions, we think that an analogy may point up the issue more sharply. If a private employer maintained a branch drug store which he wished to man with all-black personnel and if he, quixotically, wished all his personnel to be college graduates, could it be successfully argued that he violates Title VII by carrying out his plan? The college graduate requirement, if applicable where whites and blacks are in competition, would bear much more harshly on blacks, but not where only blacks are to be hired. In both cases there are several layers of analysis. On the surface each applicant is excluded from a job opportunity because of a neutral factor—height or education. To this the short female and non-college black person respond that each supposedly neutral factor actually is an indicium of their minority, since it in fact usually operates to prefer males or whites. But when we probe one layer deep-

er, we conclude that this is an inadequate response. The height or education factor does its dirty work only when there are males or whites to prefer. Absent this role of disproportionate preferment, the factor no longer distinguishes between sexes or races, but only within the sex or a race. The taint is not inherent in the factor, but contextual. *Alterat contextus, cessat ipsa lex.* In sum, we accept defendants' reasoning.

The relevant case law heavily supports this reasoning. An important line of cases is led by *Stroud v. Delta Air Lines, Inc.,* 544 F.2d 892 (5th Cir. 1977), which upheld the validity of an airline's no-marriage rule for its all-women group of flight attendants. The court reasoned:

"Here, plaintiff is not a member of one of the relevant, identifiable classes which has been discountenanced in favor of another such class. Rather, certain women—stewardesses who are unmarried—are favored over certain other women—stewardesses who are married. As one of the all-female group of flight attendants employed by Delta, plaintiff suffered a discrimination, but it was based on marriage and not sex. Men were not favored over women; they simply were not involved in the functioning of the police." *Id.* 544 F.2d at 893.

*See also DeVolld v. Bailar,* 568 F.2d 1162, 1163–64 (5th Cir. 1978) (promotion of one Mexican-American removes any possibility that the plaintiff can prove that her situation is due to discrimination against her as a Mexican-American).

Plaintiff attempts to distinguish these cases as generally involving discharge standards which did not automatically exclude 80 per cent of the available female applicant pool. This does not seem persuasive to us. Although particular lawsuits involving such rules as no-marriage may have arisen in a discharge context, the rule itself effectively excludes married women from applying.

Plaintiff relies heavily on a case in which the court held that black plaintiffs had

made out a prima facie case by showing that one component of a selection process for promotion to Welfare Eligibility Supervisor, a written examination, had a disparate impact on them and operated as a pass-fail barrier to their further consideration, notwithstanding the fact that the total selection process did not have a disparate impact on black candidates. *Teal v. Connecticut*, 645 F.2d 133 (2d Cir. 1981) *cert. granted*, —— U.S. ——, 102 S.Ct. 89, 70 L.Ed.2d 82 (1981).[3]

In *Teal* plaintiffs sought to gain permanent status as supervisors. They first had to pass a written examination. From the resulting eligible pool the appointing authority considered past performance, recommendations of supervisors, seniority, and, not least, affirmative action considerations. This particular examination resulted in a pass rate for black candidates that was only 68 per cent that of white candidates. Yet the final result was a promotion rate of 23 per cent of the black applicants and 13.5 per cent of the white applicants.

The case followed and overruled *Brown v. New Haven Civil Service Board*, 474 F.Supp. 1256 (D.Conn.1979), in which, as in most other similar cases up to that time, the court, in examining for disparate impact, had looked at the selection process as a whole, rather than any particular stage or segment.[4] *Brown*'s two compelling reasons had been the palpable problems of court management if courts were to examine "subtests, sub-subtests, and even individual questions", *id.* at 1262, and its concern that Title VII not be construed to prevent a municipality's resorting to affirmative action to *guarantee* a fit between minority hiring and the minority applicant pool, not leaving matters entirely to the random workings of a non-discriminatory selection process.

In overruling *Brown*, the *Teal* court reasoned that the overview-of-the-whole-process approach is justifiable only where each candidate's total score is made up of negative (disparate impact) and positive (affirmative action) factors in equipoise. All candidates would share in both burdens and offsetting benefits. But, the court concluded, if there is a discriminatory pass-fail barrier that excludes individuals from an opportunity to be later evaluated, belated "corrective" action is of no avail. 645 F.2d at 139.

 As our previous discussion would indicate, we do not follow the *Teal* approach. Absent any discriminatory purpose, we see no justification for looking behind a result that does not reveal a hiring

---

**3.** We note our discomfiture at learning only by our own research, after oral argument in March, 1982, of the granting of certiorari five months earlier. The question presented is:

"In Title VII action in which final outcome of employee selection process does not result in adverse impact against plaintiffs' minority group, can plaintiffs make prima facie showing of employment discrimination by merely establishing: (1) that they failed to succeed on component of selection process and thereby became ineligible to proceed further in selection process, and (2) that results of such component had disparate impact on plaintiffs minority group?" (50 U.S.L.W. 3054).

This is really the mirror image of the case before us. In *Teal* and other such cases, *see infra*, the defusing of disparate impact came at the end of the selection process; in the instant case the initial decision to hire only women made defusing unnecessary.

**4.** The *Brown* court's comprehensive catalogue of authorities pursuing this approach is as follows:

"*Friend v. Leidinger*, 588 F.2d 61, 66 (4th Cir. 1978), *aff'g* 446 F.Supp. 361 (E.D.Va.1977); *Rule v. Ironworkers Local 396*, 568 F.2d 558, 565, n.10 (8th Cir. 1977); *Smith v. Troyan*, 520 F.2d 492, 497–98 (6th Cir. 1975); *Lee v. City of Richmond*, 456 F.Supp. 756, 771 (E.D. Va.1978); *cf. Kirkland v. New York State Department of Correctional Services*, 374 F.Supp. 1361, 1370 (S.D.N.Y.1974), *aff'd in relevant part*, 520 F.2d 420, 425 (2d Cir. 1975) (showing that overall examination procedure has disparate results cannot be rebutted by fragmenting process and showing no disparate results in separate parts); *Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission*, 360 F.Supp. 1265, 1272 (S.D.N.Y.), *aff'd*, 490 F.2d 387 (2d Cir. 1973) (same). *Contra, Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1372–73 (5th Cir. 1974); *League of United Latin American Citizens v. City of Santa Ana*, 410 F.Supp. 873, 894–95 (C.D.Cal.1976)." 474 F.Supp. at 1261. (Footnote omitted).

that has a disproportionately adverse impact on the relevant minority labor pool. Beyond this, there are prudential problems in trying to distinguish between a selection process which is based on cumulative scores and one which involves a pass-fail threshold followed by other selection steps. As a comment in 23 Boston College Law Review, Dec.1981, Annual Survey of Labor Law 84, 278–279 puts it:

"In its discussion of the *Brown* case, the *Teal* court did not address Brown's statement that '[e]ven in a cumulatively scored application process, a score on any single component might be so low as to preclude the accumulation of a total score meeting a minimum hiring requirement.' 474 F.Supp. at 1262, 20 FEP Cas. at 1380. In light of that observation, it is evident that the distinction between the two types of selection processes is not so neat . . . . Furthermore, it is only on the basis of the existence of the distinction that the *Teal* court dismisses the concern that courts will be burdened excessively by examining isolated sub-tests. 645 F.2d at 139, 25 FEP Cas. at 533 . . . . The court fails to explain convincingly why the burden of examining sub-tests is lighter in the process with a pass-fail barrier."

We therefore conclude that the district court erred in deeming that the men-women height statistics established a prima facie case under the circumstances we have described. So concluding, we need not decide other issues.

It is perhaps worth emphasizing what we have not held or intimated. First, we have not dealt with a selection process that uses a facially neutral requirement in circumstances belying the good faith of the employer. For example, if it were the case that rather extreme requirements were set with the result that positions nominally reserved for women were seldom filled and then only after inordinate delay, this would involve disparate treatment analysis and the concomitant need, easily met, to prove discriminatory purpose.

Second, this case does not deal with an equal protection challenge against a height restriction on behalf of short women, where there is proof that the employer devised the requirement "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group. [Footnote omitted.]" *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

Third, this is not a case where the selection process incorporated criteria that were so demeaning to women as to constitute institutionalized harassment. *Cf. Tomkins v. Public Serv. Elec. & Gas Co.*, 568 F.2d 1044, 1046 n.1 (3d Cir. 1977) [court does not pass on theory that sexual harassment created "an environment of debilitating sexual intimidation"]; and *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981) [sexual harassment even without adverse employment consequences, can be a violation of Title VII, in that it creates a "discriminatory environment"].

Finally, this is not a case where there is evidence that replacing one female with another was to cover up a discriminatory act. *See Equal Employment Opportunity Commission v. Tufts Institution of Learning*, 421 F.Supp. 152, 165 (D.Mass.1975).

*The part of the judgment relating to denial of employment from the all-women list of August 12, 1974 is accordingly reversed.*