James T. WILMORE, William D. Pearson, and Alonzo Hooten, Plaintiffs,

v.

The CITY OF WILMINGTON, Defendant and Third-Party Plaintiff,

v.

WILMINGTON FIREFIGHTERS LOCAL 1590, INTERNATIONAL ASSOCIA-

TION OF FIREFIGHTERS, Third-Party Defendant.

Civ. A. No. 80–76.

United States District Court, D. Delaware.

Jan. 19, 1982.

Gary W. Aber, Biggs & Battaglia, Wilmington, Del., for plaintiffs.

Jeffrey S. Goddess, City Sol., Frederick H. Schranck, Asst. City Sol., Wilmington, Del., for defendant and third-party plaintiff.

Charles P. Brandt, Brandt & Benson, Wilmington, Del., for third-party defendant.

## OPINION

STAPLETON, District Judge:

Since 1921 the City of Wilmington has employed paid professional firefighters. Not until 1961, however, did the Bureau of Fire include any blacks or hispanics in its ranks.[1] (PX–8). The number of minorities has increased substantially since 1971; blacks and hispanics now comprise about 15% of the force.[2] But despite gains in hiring, they remain significantly under-represented in the higher ranks of the Bureau.[3] In 1980, the City appointed its first black fire Captain and elevated one additional black firefighter to the rank of lieutenant.

Like many other public institutions throughout the country, the Wilmington Bureau of Fire has a history of racial discrimination which today it freely acknowledges.[4] See, Defendant's Opening Post-Trial Brief, Docket Item ("D.I.") 146 at 4. That entire history is not now before this Court.[5] Rather, the issue I must decide is whether a continuing pattern of discrimination is manifest in the procedures adopted to select firefighters for promotion to lieutenant in 1978 and 1980.

Plaintiffs, on behalf of a class of minority firefighters,[6] have challenged the 1978 and 1980 promotional exams under the Civil Rights Act of 1866, 1871 and 1964.[7] This Opinion sets forth the Court's findings of fact and conclusions of law following a one week trial on the issue of liability.

## I. THE WILMINGTON BUREAU OF FIRE: AN OVERVIEW.

### A. Organization.

Like most fire departments, the Wilmington Bureau of Fire has a clearly delineated hierarchy. The bottom rung, probationary firefighters, "rookies", spend a year mastering the basic skills of firefighting. They customarily acquire experience in two of the three positions in an engine company: "hydrant man" and "nozzle man". (See Rules and Regulations of the Bureau of Fire, Arts. 30, 31 (1978); PX–23). With greater experience firefighters may have

---

1. The first black firefighter hired is now-Captain Victor L. Newman.

2. See PX–8. According to the testimony of Deputy Chief Kane, the recruit class of 1980 included eight whites, seven blacks and one hispanic. This would mean there are a total of thirty-six minority employees in the 240 man Bureau.

3. Two of the fifty-one officers are black, about 4% of the total.

4. Wilmington's own history of racial discrimination is chronicled in R. Kluger, Simple Justice (1975) at 425–450, and J. Raffel, The Politics of School Desegregation: The Metropolitan Remedy in Delaware (1980). See also, Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Evans v. Buchanan, 379 F.Supp. 1218 (D.Del.1974) (three judge court).

5. In 1972 Congress amended Title VII to include State and local governments within the class of persons liable to suit under 42 U.S.C. § 2000e(a), Pub.L. 92–261 § 2(1), 86 Stat. 103. "A public employer who from that date forward made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposely excluding Negroes." Hazelwood School District v. United States, 433 U.S. 299, 309 & n.15, 97 S.Ct. 2736, 2742 & n.15 (1977).

6. See, Memorandum Opinion, C.A. 80–76, filed May 19, 1981, D.I. 75.

7. 42 U.S.C. §§ 1981, 1983 and 2000e, et seq.

the opportunity to drive the apparatus. The complement of the longer ladder truck also includes a "tiller man" who steers the rear portion of the segmented vehicle. (PX–23, Art. 29).

Some firefighters are detailed to day jobs. The Fire Marshal's Office is responsible for building inspection, public information concerning fire safety, and other tasks related to fire prevention and the detection of arson. (PX–23, Art. 36). At one time the Fire Marshal's Office was a haven for the "sick, lame and lazy" assigned to light duty, but this has not been the case through most the 1970s. In 1977, the Bureau created the Office of Data and Statistics. The single firefighter assigned to this office reviews and compiles forms submitted by the engine companies. (PX–23, Art. 26). Fire Communications, another desk job within the Bureau, dispatches engine companies to the scene when a blaze is reported. (PX–23, Art. 37).

The Bureau also assigns a few firefighters to serve as Aides to its Battalion Chiefs. The Aides drive the Battalion Chiefs to the firegrounds, relay the Chief's instructions to the fire companies which have responded to the alarm, and assist the Chief in completing various administrative tasks. (PX–23, Art. 35). The administrative side of an aide's job generally includes typing or preparing alarm reports and memoranda, and helping the Chief adjust the status board which records the strength of each of the companies assigned to his shift.

When the officer who ordinarily commands an engine company is sick or on leave a firefighter is designated the "Temporary Acting Lieutenant" ("TAL"). A TAL performs all of the command duties ordinarily carried out by a lieutenant, including the completion of administrative forms such as attendance rosters or alarm reports.

After serving three years in grade, a firefighter is eligible to begin his ascent in the Bureau by taking an examination for promotion to the next rank in the hierarchy.[8] The lieutenant is the commanding officer of the engine company. (PX–23, Art. 15).[9] Senior to him in rank are the Captains, Battalion Chiefs, Deputy Chiefs and the Chief of Fire. Captains may command a piece of apparatus, such as a ladder truck, and have command responsibility for the station houses. (PX–23, Art. 13). Battalion Chiefs assigned to Fire Suppression supervise all fireground operations except minor car and brush fires. As in the case of Lieutenants, Captains and Battalion Chiefs are chosen by means of a competitive promotional examination. The Deputy Chiefs are each responsible for a major departmental subdivision: Operations, Fire Prevention, or Administration. Over them is the Chief of Fire, who reports to the Commissioner of Public Safety and the Mayor.

B. *Looking Backward: The Connell/Anderson And Malloy Litigation.*

Since 1972, when Congress extended Title VII of the 1964 Civil Rights Act to municipalities, the Bureau of Fire has administered four promotional examinations. Although only the 1978 and 1980 exams are involved in this case, the "turmoil" which surrounded the earlier tests is an important piece of background to development of the later exams. Both the 1973 and 1974 promotional procedures embodied a substantial subjective component. Each candidate's score included evaluations by his immediate superior officers, the Chief of Fire, and the Commissioner of Public Safety, as well as a score on a written examination.

The results of the 1973 and 1974 tests inspired charges of "cronyism". After the Bureau posted the results of the 1974 exam, the Union entered into negotiations with the City. In 1976, shortly after resigning from the Bureau, former Deputy Chief Thomas Savage accused then Chief of Fire James Blackburn of having manipulated the scoring procedures to predetermine the

---

8. Promotional examinations are administered biennially, under the City's contract with the International Association of Firefighters, Local 1590 ("the Union"). *Cf.* DX–16.

9. The descriptions given are of the duties of officers assigned to Fire Suppression. Officers of all ranks also fill administrative posts within the Bureau.

final rankings on the 1974 exam. Savage's charges provided a basis for the widespread suspicions of unfairness. The City and the Union agreed that there would be no final promotions made from the 1974 promotion list. Instead, the City appointed "Designated Acting Lieutenants", ("DALs"), to serve as company commanders pending final resolution of the dispute.

In May 1978, this Court approved a settlement between the City and a class of unsuccessful candidates for promotion on the 1974 exam, who claimed a property interest in the City Charter provision requiring merit selection.[10] See DX–12, Anderson v. City of Wilmington, C.A. 76–182 (D.Del. Order filed May 15, 1978). As part of the settlement, the City named a new group of DALs based upon a sub-total of the 1974 scores which did not include the Chief's or Commissioner's ratings. Some DALs selected in 1976 returned to the ranks, others were elevated pending the administration of the 1978 promotional exam.

In 1978, Savage disclosed allegations of similar improprieties in the administration of the 1973 promotional test. This Court has found liability, but has not yet determined a remedy for due process violations arising from these charges. See Malloy v. City of Wilmington, C.A. 78–374 (D.Del. Opinion filed December 16, 1981).

### C. The 1978 Exam.

In an effort to restore credibility to its beleaguered promotional system, the City hired the William E. Clark Company in 1977 to develop a new promotional process. In June of that year the Clark Company submitted a Study (PX–12) outlining its plan for the design and validation of the new procedure. The initial study proposed a four part evaluation scheme: an "experience factor", computed on the basis of seniority; evaluation by supervisors; an oral problem; and a written exam.

The first step in test design, according to the study, was a "job analysis". The Clark Company surveyed twenty-two incumbent

lieutenants, asking them to rank tasks on a scale of difficulty, criticality to overall job performance, and amount of time spent. (See PX–18, 20). While the Clark Company's work was still in progress, Jerome Donohue replaced Blackburn as Chief of the Bureau of Fire.

In view of the Bureau's recent experience with subjective ratings, Donohue eliminated the supervisor's points from the 1978 test. The final procedure included three components. A written examination, worth fifty of the one hundred total promotion points, contained one hundred multiple choice questions. Many of the questions were taken from the Bureau's Operations Manual, or from two texts: Fire Service Management, by Donald F. Favreau, and Clark's own book, Fire Fighting: Principles and Practices. The oral examination posed a hypothetical fireground situation. After reviewing the facts, candidates were required to present their analysis orally to a board composed of three senior officers. This portion of the test was worth forty percent of the overall score. The balance of the final ranking depended upon the experience factor. Candidates received from eight to ten points, depending upon length of service. (JX–1).

Although the Clark study recommended that the Chief fill each vacancy at his discretion from the top three persons on the promotion list, a "rule of three", the City adopted a policy of strict rank-ordering. Each vacancy to be filled by the highest scorer remaining unpromoted until the promotional list expired after two years. Clark appended a Certificate of Validation to the examination, which promised validity "based on fairness, quality of the men selected, [and] EEO liability". (PX–13).

On October 15, 1978 the Bureau posted the test results. Seventy-three candidates completed the examination, sixty-five white and eight minority. Of the top twenty finishers, only one, ranking eighteenth, was

10. 1 Wilm. C. (Charter) § 7–102.

a minority. All eleven firefighters promoted from the 1978 list were white.

On November 20, 1978, firefighter Alonzo Hooten filed a charge of unlawful discrimination with the Delaware State Department of Labor. (DX–1). Hooten claimed that the 1978 exam had produced a disparate impact on minority candidates; that the absence of standardized questions on the oral part of the exam made possible the illicit manipulation of scores; and that he was misled as to the context of the oral examination.[11]

### D. *Back To The Drawing Board: The 1980 Test.*

Minority firefighters were not alone in their dissatisfaction with the 1978 test results. Gale Templin, the City's Affirmative Action Officer, expressed her concern about both the impact of the 1978 exam on minority candidates and the inadequacy of the Clark Company's purported "validation". Templin did not base her assessment of the test on a detailed statistical analysis. She felt that the absence of any minority promotions was "not a desirable result", whether there was a statistically significant disparate impact or not.

In January 1980, Templin contacted Dr. Barry Morstain, an Associate Professor at the University of Delaware who also heads a private consulting firm. In late February, Morstain met with Fire Chief Donohue and Deputy Chiefs Kane and Hanley. Morstain agreed to develop a new procedure for the 1980 examination, but cautioned that the "posting date" required by its contract with the Union would not allow sufficient time for a complete validation study or a total revamping of the 1978 test. Morstain proposed that the Bureau abandon strict rank-ordering and make 1980 promotions from a pool of qualified applicants.

He also recommended that the board to whom the 1980 candidates would present their oral examination be instructed in a standardized scoring regime, so that the test results would be fair and consistent. Chief Donohue rejected the former proposal, fearing that it would revive charges of favoritism in the Bureau. The Chief did agree to adopt a more formal scoring method for the 1980 oral exam, and also recruited a black Battalion Chief from the Philadelphia Fire Department to sit as an examiner. (*See* PX–9, Tabs 6 and 7; Tr. D. 21).

Like its predecessor, the 1980 examination included a one hundred question written test. This score was not used to compute a final ranking; it was a pass-fail threshold for eligibility to compete on the other phases of the exam. All of the blacks who took the 1980 exam passed the written test; several whites failed.

As before, the experience factor counted for ten percent of the overall rating. The oral portion of the test increased in value, to sixty percent of the total. The remainder, thirty percent of the total, came from the score on the Administrative Task Analysis ("ATA") portion of the test. Morstain based this weighting on the Lieutenant's Job Analysis performed before the 1980 exam, in which the incumbent lieutenants estimated that they spent, on average, thirty percent of their time on administrative matters. (Tr. D–8–9). The ATA consisted of sixteen administrative forms which made up a lieutenant's routine administrative burden. (PX–9, Tabs 4, 5). Candidates earned points only for a perfect form, and test scoring was "banded", so that 13–16 correct forms earned four points; 9–12 earned three, and so on.[12] In designing this part of the 1980 test Morstain assumed that all firefighters had substantial exposure to

---

11. Hooten also charged that blacks scored lower than did whites on the oral part of the 1978 test. In fact, the black mean test score was 27.76, slightly higher than the 27.32 mean score of white candidates.

12. At trial plaintiffs suggested that score-banding exaggerated the disparate impact of the ATA on minorities. This is not so. Had points been allotted for each form, and the ATA retained its thirty percent weight, no minorities would have been promoted in 1980, although

the forms used through their experience as TALs.[13]  (Tr. D. 27).

A total of seventy-two firefighters completed the 1980 exam, sixty-one of them white, ten black and one hispanic.  Four of the top twenty finishers were black.  Somewhat to Chief Donohue's surprise and consternation, however, only one, ranking seventh, finished high enough to be promoted.

## II.  THE DISPARATE IMPACT CLAIM.

■   Plaintiffs filed this suit on February 20, 1980.  In their complaint they alleged violations of Title VII and Title 42, United States Code, Sections 1981 and 1983.  To prove liability under either of the Reconstruction era statutes, or under the "disparate treatment" branch of Title VII, plaintiffs must establish that the City acted with a discriminatory motive.  *Croker v. Boeing Co. (Vertol Div.)*, 662 F.2d 975 (3d Cir. 1981) (en banc) (Section 1981); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Section 1983); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1097 (1981) (Title VII).

■   Proof of intentional discrimination is unnecessary under the "disparate impact" line of authority which finds its origin in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The Third Circuit recently summarized the standard for proof of a disparate impact case:

Plaintiffs may also seek to prove title VII violations by challenging "practices that are facially neutral in their treatment of different groups but in fact fall more harshly on one group than another and cannot be justified by business necessity."  [*International Brotherhood of Teamsters v. United States*, 431 U.S. 324,]

at 335–36 n.15 [97 S.Ct 1843, 1854–55, n.15, 52 L.Ed.2d 396]; *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).  Under the disparate impact theory, once a plaintiff makes out a prima facie case of disproportionate impact—that black employees "suffered substantially disproportionate effects from the application of a seemingly neutral policy," *see EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188, 191 (1980) —a defendant must offer evidence to show that the challenged requirement has a manifest relation to employment.  *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *NAACP v. Medical Center, Inc.*, 657 F.2d 1322 at 1333 (3d Cir. 1981) (en banc).

As with claims of discriminatory intent, the burden of persuasion remains at all times with the plaintiff.  *See id.*, at 1336.  Thus, the defendant need only come forward with evidence to meet the inference of discrimination raised by the prima facie case.  The plaintiffs may then demonstrate that the employer's reason is a pretext for discrimination and that "a feasible yet less onerous alternative exists."  *See id.*, at 1334–1335.

*Croker v. Boeing, supra*, 662 F.2d at 991.  *See also, Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

■   The "seemingly neutral polic[ies]" which plaintiffs allege to have had a disparate impact upon minority firefighters are the promotional tests used in 1978 and 1980.[14]  In support of this allegation, plaintiffs have offered several types of evidence.  They contrast the proportion of minorities in the labor force of the Wilmington area to the far smaller percentage of minorities in the Bureau's officer corps.  They have ana-

---

two scoring in the top twenty would have moved up in the ranks.

13.  In the period between January 1, 1977 and the 1980 exam, blacks averaged 55.4 TAL shifts, whites averaged 38.5.  *See* PX–4.

14.  The complaint, D.I. 1, (¶ 26(b)) suggests that plaintiffs originally intended the procedure for assigning administrative jobs to be an independent ground for relief.  This claim was not presented in the Pre-Trial Order, D.I. 126, or at trial.

lyzed the results of the 1978 and 1980 tests which showed that whites were promoted in greater proportion to their numbers in both years. Plaintiffs have also introduced evidence tending to show that assignments to certain "administrative jobs" within the Bureau depend upon race, and that the promotional exams gave an advantage to the firefighters—all white—who held those positions. Last, plaintiffs have attempted to show that conscious racial bias lingers in the Bureau, and that this bias has tainted the promotional system. Upon this foundation, plaintiffs claim to have erected a prima facie case. Because much of this evidence has only limited probative value on the ultimate issue—Did either promotional examination favor whites over minority candidates?—I am not persuaded that plaintiffs have met their threshold burden.

### A. *Labor Force Statistics.*

The statistical evidence portrays the stark disparity between the racial makeup of the population in and around Wilmington and of the leadership ranks of the Bureau of Fire. According to a recent study, the male labor force of the City of Wilmington between the ages of twenty-two and forty-four for fiscal year 1982 is estimated to be 48% minority. The labor force of New Castle County is 11.7% minority. Although the City has a residency requirement for City employees, initial hiring is open to individuals who live outside the City limits. 1 Wilm. C. (Charter) § 3–304; 1980 Rules and Regulations (PX–24) § 3:02. *Cf. Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). The Bureau's officer

corps numbers fifty-one; after the most recent promotions only two are minorities. According to plaintiffs' statistical expert [15] the probability that such a disparity between work force and officer corps would result from chance is virtually 0% if one looks only at the City of Wilmington, or 3.4%, looking to New Castle County. Both figures satisfy the customary tests of statistical significance.[16] (*See* Tr. A. 37–40).

"[A]bsent explanation, it is ordinarily to be expected that non-discriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the community from which employees are hired." *Hazelwood School District v. United States, supra,* 433 U.S. at 307, 97 S.Ct. at 2741, *quoting International B'hood of Teamsters v. United States, supra,* 431 U.S. note 20 at 340, 97 S.Ct. note 20 at 1857. In *Hazelwood,* however, the Court went on to caution that, "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." 433 U.S. note 13 at 308, 97 S.Ct. note 13 at 2742.

Plaintiffs—all of whom are members of the Bureau of Fire—do not contend that some experience as a firefighter within the Bureau is not a necessary qualification for a lieutenancy. The relevant work force in this case is therefore the firefighter ranks of the Bureau, just as it was limited to school teachers in *Hazelwood.* "[S]tatistics must bear some direct relationship to the applicant pool and the position sought."

---

15. Dr. Norfleet Rives, Associate Prof. of Mathematical Sciences and Urban Affairs and Public Policy at the University of Delaware.

16. Although the courts have not always addressed the significance of the statistics on which they rely, most which have done so have adopted the 5% standard. *See* B. Schlei & P. Grossman, *Employment Discrimination Law* (1976) (hereinafter "Schlei & Grossman") at 1188–91; 29 C.F.R. § 1607.5(c)(1); *Commonwealth v. Rizzo,* 466 F.Supp. 1219, 1229–1231 (E.D.Pa.1979). In *Castaneda v. Partida,* 430 U.S. 482, note 17 at 497, 97 S.Ct. 1272, note 17

at 1281, 51 L.Ed.2d 498 (1977), a jury selection case, the Court noted "a general rule for ... large samples, if the difference is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." For a general discussion of statistical significance, see D. Freedman, R. Pisani, & R. Purves, *Statistics* (1978) at 441–45; M. DeGroot, *Probability and Statistics* (1975) at 381–84. *See also,* Shoben, *Differential Pass-Fail Rates in Employment Testing: Statistical Proof Under Title VII,* 91 Harv.L.Rev. 793, note 41 at 803 (1978).

*Smithers v. Bailar*, 629 F.2d 892, 899 (3d Cir. 1980). *See also Mazus v. Dept. of Transportation*, 629 F.2d 870, 875 (3d Cir. 1980), Schlei & Grossman (Supp.1979) at 296–305. The population/work force data does not have such a relationship to the results of the Bureau's promotional process.[17]

## B. *Test Results.*

■ "To establish a prima facie case of employment discrimination under the disparate impact theory, the plaintiff must demonstrate a causal connection between the challenged policy and the racially unequal result." *EEOC v. Greyhound Lines*, 635 F.2d 188, 193 (3d Cir. 1980). Proof of causation, like proof of intent, must often be indirect. *See Int'l. Brotherhood of Teamsters v. United States, supra*, 431 U.S. note 20 at 340, 97 S.Ct. note 20 at 1857. Courts commonly resort to statistical inference to distinguish disparate impact from random variation.[18] *See, e.g., Int'l. Brotherhood of Teamsters, supra*, 431 U.S. at 329, 97 S.Ct. at 1851; *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (jury selection); *Hazelwood School District v. United States, supra, Dothard v. Rawlinson, supra.*

Although shrouded in the language of expertise, statistics are merely one form of circumstantial evidence which may support a theory of causation. Evidence that whites are promoted, hired, demoted, or discharged at a rate very different from that of minorities may lead us to reject the most likely explanation for a difference—chance—and adopt the next most probable explanation, given this country's unfortunate history—race.

Superficially, plaintiffs' statistical evidence that whites did better than minorities appears convincing. In 1978, eleven whites were promoted and no minorities. In 1980, the figures were eight whites and one minority. The Bureau included 141 white firefighters and twenty-eight minority firefighters in 1978, about a five to one ratio.[19] In 1980, there were 143 whites and twenty-seven blacks and hispanics. (PX–8). If promotions were exactly proportionate to the racial composition of the firefighter ranks, one would expect to have seen 1.8 minority promotions in 1978, and 1.4 minority promotions in 1980.[20] Minority candidates thus received fewer promotions than they would have received if there had been an exact relationship between population percentages and promotions. But this analysis is a misleading one.

Expected values estimate the results of a process, *on average*. Although one would expect, over time, that a coin will land heads up half of the time, it is actually unlikely that this precise result will occur over any given number of coin tosses. Likewise a fair die should show each face about one-sixth of the time on average. But nobody would show great surprise if one number showed up more frequently over a small number of rolls. Statistical analysis attempts, therefore, to compare the expected result with the observed result in order to determine how likely it is that the difference is due to chance.

To do this the statistician constructs a model of the real situation which makes certain assumptions. In this case, Dr. Rives analogized the promotional system to a process in which a ball is drawn from a container. Balls are either black or white,

---

17. The evidence points rather to an indirect relationship. Past discrimination in hiring has created a pool of qualified applicants—in the broadest sense, all of the firefighters—which is disproportionately white. But this disparity is not actionable under Title VII. *See Hazelwood School District, supra*, 433 U.S. at 309, 97 S.Ct. at 2742. The acts challenged here are the means of selection from the "qualified" pool, rather than the process which created the initial pool.

18. See the thorough discussion of this issue in *Commonwealth v. Rizzo, supra*, 466 F.Supp. at 1228–29.

19. Not all firefighters were allowed to take the promotional exam because of the three year rule, *see* page 40 *infra*. But since that rule is part of the process, it should be considered in assessing any disparate racial impact.

20. $28/169 \times 11 = 1.8$. $27/120 \times 9 = 1.4$.

representing white and minority firefighters. If we assume that the person selecting the balls cannot tell the color before removing them from the container, we have a random selection process, one which treats blacks and whites the same. Dr. Rives estimated the probability that the observed results—eleven white and no minority promotions in 1978, eight white and one minority in 1980—would occur given such a random process. For 1978, depending upon whether the pool included only those who took the test, only those eligible to take the test, or all firefighters, the probabilities were 16.3%, 27.6% and 15.6% respectively.[21] (Tr. A. 51–52). For 1980, using the same populations, the results are 37.2%, 40.2% and 35.7%.

Unless the populations which are sampled are very large, it is virtually inevitable that there will be a difference in selection rates between any two sub-groups. *See City of Los Angeles v. Manhart,* 435 U.S. 702, note 20 at 711, 98 S.Ct. 1370, note 20 at 1377, 55 L.Ed.2d 657 (1978). Consequently, one must find a rule of decision which determines whether the observed result is so unlikely as to justify rejecting the original hypothesis. There are two basic approaches to this problem in Title VII cases: the five percent rule most frequently used in the courts[22] and the four-fifths rule adopted by the EEOC.[23]

The four-fifths rule looks first at the "absolute" difference between selection rates:

Selection rate for any race, sex or ethnic group which is less than four-fifths ($4/5$) (or eight percent) of the rate for the group with the highest rate will generally be regarded by Federal enforcement agencies as evidence of adverse impact. . . . Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a users' actions have discouraged applicants disproportionately on the basis of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant, or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of the normal pool of applicants from that group.

Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(d) (1978). Although if applied mechanically the four-fifths rule would lead to absurd results, *see* Shoben, note 16, *supra,* 91 Harv.L.Rev. at 806–811, the EEOC Guidelines do not propose that it be so applied. Four-fifths is a rule of thumb which must be considered along with the size of the sample, to form the basis for a conclusion about the statistical likelihood of such a disparity.

The five percent rule focuses directly on statistical significance. *See* note 16, *supra.* If the probability that the observed result of the selection process could occur in a racially neutral manner is less than five percent, then the Court will conclude that there is a disparate impact as a result of race.[24]

---

21. A homely example may help to pierce the veil of statistical mystery. Suppose one is playing dice against an unknown opponent—someone one has no reason to suspect of cheating. The probability of rolling a seven on any given roll of two dice is one in six, or 16.7%. Although one might be disappointed, one would be unlikely to question the fairness of the game simply because your opponent rolled a seven on his or her first toss. The probability of the observed result on the 1978 exam is only slightly below the likelihood of rolling that first seven.

22. *See* note 16, *supra.* *But see Segar v. Civiletti,* 508 F.Supp. 690, 700–701 (D.D.C.1981) (applying 10% significance rule).

23. The EEOC has also endorsed five percent as a standard of statistical significance in a related context. 29 C.F.R. § 1607.14(a)(5).

24. The two or three standard deviation rule is similar in approach, but more stringent. The Supreme Court endorsed the two or three standard deviation rule in *Castaneda v. Partida, supra,* a jury selection case. *See* note 16, *supra.* For a thoughtful application of probability theory to a legal problem, *see* Kaye, *Probability Theory Meets Res Ipsa Loquitor,* 77 Mich. L.Rev. 1456 (1979).

Bearing in mind the need to judge the statistical significance of the result, I turn initially to the four-fifths rule.[25] Looking first at those who took the test for promotion in 1978, the white promotion rate was 17%. Four-fifths of 17% is 13.5%. Since the actual black promotion rate was 0%, the four-fifths rule is violated. In 1980, the white rate was 13.1%; the minority rate was 9.1%, again less than four-fifths. This, however, is one of those cases, spoken of in the Guidelines, in which the differences in promotion rates are based on small numbers and are not statistically significant. As previously noted, the probability of such differences resulting purely from chance are at least 15.6% in 1978 and 35.7% in 1980. Thus, in neither instance, is the difference anywhere near statistically significant at the five percent level.

Other gross statistics tend to undercut the weak statistical inference of discrimination which results from measuring by rule of thumb. In both years there is no significant disparity between black and white mean (average) test scores. In 1978, whites scored 75.85 on average, while minorities scored 75.71. In 1980, blacks did better on average, 10.3 compared to 10.2. Although as plaintiffs note, the crucial question is whether there is a disparity in promotions, not test scores, a comparison of mean scores does give some information about the racial impact of the test. *Cf. United States v. City of Chicago*, 549 F.2d 415, 429 (7th Cir. 1977).

Although plaintiffs' case is substantially stronger with respect to 1978 than it is with respect to the 1980 promotional exam, in neither year is it sufficient to justify rejecting the hypothesis that the racially neutral practice is, in fact, neutral, and that the differences in result are due to chance. Comparisons of promotion rates do not, therefore, establish a prima facie case.

C.  *"Administrative Experience".*

Recognizing the weakness of the "direct" statistical evidence of disparate impact, plaintiffs have presented testimony and statistical data which sets out to establish a two link chain connecting race and promotion. Plaintiffs have identified four jobs within the Bureau which they contend gave firefighters who held them an advantage on the 1978 and 1980 tests: Battalion Chiefs' Aide ("BCA"), Designated Acting Lieutenant ("DAL"), Data and Statistics Office Staff ("D&S Staff"), and Fire Marshal's Office Staff ("FMO Staff"). They have also sought to show that race was a factor in assigning firefighters to those jobs. This "administrative job experience", plaintiffs argue, explains how whites did better on the promotional test than blacks.[26]

Defendants objected to much of this evidence because most of the job assignments occurred before the limitations period applicable to the Title VII case, and because the "administrative experience theory" was not presented in the EEOC charge. Neither is a valid ground for objection.

1.  *The limitations period.*

■■ On November 15, 1978, plaintiffs filed the initial charge of employment discrimination with the Delaware Department of Labor, as they were required to do, 42 U.S.C. § 2000e–5(c); 29 C.F.R. § 1601.74. This Court, therefore, has jurisdiction only over Title VII violations which occurred on or before May 25, 1978.[27]  42 U.S.C.

---

**25.**  This Court is not bound by the EEOC Guidelines, but "[t]he administrative interpretation of the Act by the enforcing agency is entitled to great deference." *Griggs v. Duke Power, supra,* 401 U.S. at 433–34, 91 S.Ct. at 854–55. This is particularly so when the interpretation involves matters—such as statistical inference—beyond judicial expertise.

**26.**  By presenting a credible explanation of how the disparate impact occurred, plaintiffs hope to bolster the inconclusive statistical data offered to show such an impact. Although, as

Dr. Siskin testified, one cannot conclude that because a correlates with b, and b correlates with c, a must also correlate with c, (Tr. D. 97–99), nevertheless the correlations may point to causal relationships from which the inference "a causes c" may be drawn.

**27.**  The three year limitations period governing the Section 1981 and 1983 claims begins on February 20, 1977. *See Ricks v. Delaware State College*, 22 F.E.P. 788 (D.Del.1978), *rev'd on other grounds*, 605 F.2d 710 (3d Cir. 1979), *rev'd sub nom Delaware State College v. Ricks,*

§ 2000e–5(e). *See, United Airlines v. Evans*, 431 U.S. 533, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).[28]

Plaintiffs do not assert that "administrative" job assignments prior to the limitations period establish an independent basis for relief. In Title VII "Congress has . . . required that the posture and the condition of the job seeker be taken into account." *Griggs v. Duke Power, supra*, 401 U.S. at 431, 91 S.Ct. at 853. Events which transpired before the limitations period, such as job assignments, are a part of this "condition", just as pre-Act differences in education were a part of the circumstances causing a disparate impact in *Griggs*. Unlike *United Airlines, supra*, and *Ricks, supra*, the adverse consequences of the alleged pre-Act discrimination here were not fixed and foreseeable at the time of the original discriminatory conduct. *Compare Bronze Shields, Inc. v. New Jersey Dept. of Civil Service*, 667 F.2d 1074 (3d Cir. 1981). Here, the potential impact of job assignments on subsequent promotion was speculative at best.

The City's liability, if any, rests only on post-limitations period conduct. But these acts operate upon a matrix of pre-existing facts which may cause a facially neutral selection procedure to have a disparate racial impact.

2. *The scope of the EEOC complaint.*

■ "Once a charge of some sort has been filed with the EEOC, the scope of the resulting private civil action in the district court is 'defined by the scope of the EEOC investigation that can reasonably be expected to grow out of the charge of discrimination,'" *Hicks v. ABT Associates, Inc.*, 572 F.2d 960, 966 (3d Cir. 1978), quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 -99 (3d Cir. 1976), *cert. denied*, 429 U.S.

1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). *Accord, Sanchez v. Standard Brands*, 431 F.2d 455, 466 (5th Cir. 1970) *EEOC v. E.I. duPont & Co.*, 373 F.Supp. 1321, 1335 (D.Del.1974); *aff'd on other grounds*, 516 F.2d 1297 (3d Cir. 1975); *LeGare v. University of Pennsylvania Medical School*, 488 F.Supp. 1250, 1251, 1254–55 (E.D.Pa.1980). Although the charge did not allege that the purported disparity in promotions was a result of different job experience, this evidence is plainly within the scope of a reasonably diligent investigation, and properly before this Court.

### 3. *The first link.*

The evidence bears out plaintiffs' contention that assignment to some "administrative" positions in the Fire Department has depended, in part, upon race. The testimony establishes that assignments to three positions, BCA, D&S Staff and FMO Staff, have been made through an informal system in which senior officers have relied upon personal knowledge of firefighters and largely subjective criteria in making their selections. This was particularly true of Battalion Chief's Aides; the Battalion Chief exercised unfettered discretion in a process with no general publication of impending vacancies and no clear standards. "Compatibility" was regarded as the transcendent value and aides regarded the Battalion Chiefs who selected them as "guardian angels." Selection systems of this kind provide ample opportunity for operation of conscious and unconscious racial bias and such bias has clearly effected the selection of personnel for these positions in the past.

Although the applicants for the fourth position, DALs, were selected through a test, rather than a largely subjective appointment system, the test itself included subjective supervisor's points. Whether or not this subjective component had a dispa-

449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).

28. Evidence of discrimination in job assignments is obviously relevant to other claims in this case, which require proof of discriminatory intent. Pre-limitations period acts of discrimi-

nation are plainly admissible to show intent at a later time, or to show disparate . impact "where relevant aspects of the decisionmaking process had undergone little change. *Hazelwood School District, supra*, 433 U.S. note 15 at 309–310, 97 S.Ct. note 15 at 2742–2743.

rate impact on blacks, the fact remains that all of the DALs were white. Accordingly, if experience as a DAL was an advantage on the 1978 or 1980 test, it was an advantage for whites only.

Although all witnesses agreed that minority firefighters were qualified to serve in all four of the positions designated by the plaintiffs, none had ever done so until after the administration of the 1980 test.[29] Statistical evidence showed that the probability that only whites would be selected to fill these "administrative" jobs, given the racial composition of the firefighter ranks, was only 3.96%.[30]

### 4. *The chain breaks.*

The second, and crucial, step in plaintiffs' analysis is their contention that there is a causal connection between the experience offered to a firefighter who worked as a DAL, BCA, D&S Staff or FMO Staff, and performance on the promotional examinations. Proof of this proposition centers on the statistical correlation between test scores, promotion, and job experience.

In 1978 firefighters who had served in these four positions scored an average of almost seven points better than firefighters without such experience. Similarly, for 1980 the difference in average score is 1.04 points. The probability that the two groups—those who held "administrative" jobs and those who did not—would score so differently if the test treated them alike is .1% in 1978 and .5% in 1980.[31] I accept this as persuasive evidence that chance does not explain why "administrative" jobholders did better on the promotional tests than other firefighters. Common sense and a review of the content of the promotional examinations dissuades me, however, from the conclusion that it was the experience itself which accounts for the difference in score.

#### a. *The 1978 test.*

Although plaintiffs' test expert originally characterized forty-three of the 100 test questions on the written portion of the 1978 exam as "administrative", he also condemned the test as an exercise in memorization. This, together with the fact that he was unable to describe any link between experience and the content of the test, is significant. As announced prior to the exam, the written portion tested for information extracted from the Departmental Rules and Regulations and two specified text books. (PX–16). The information sought was relatively detailed and study and memorization were obviously the keys to success. While one may question whether this is a valid or useful testing procedure for promoting firemen, I am unpersuaded that it is one which treats the "experienced" differently from the "inexperienced".

The oral problem, which required analysis of a hypothetical situation, would have placed firefighters assigned to Data and Statistics and the Fire Marshal's Office at a disadvantage, since they would not have had recent exposure to fireground operations. One might expect BCAs and DALs

---

29. Arthur Madric served in the Fire Marshal's Office for a period of two weeks in December 1974 and January 1975. The first black in Data and Statistics, James Goode, was appointed after he had finished seventh on the 1980 exam. The first black Battalion Chief's Aide, Clifford Armstead, did not become a BCA until 1980.

30. I am persuaded that race has played a role in the selection of BCAs, D&S Staff, and FMO Staff, despite the fact that Dr. Rives's methodology is open to some dispute. He excluded Fire Communications from the "administrative" group in part because no one who held that job was promoted. This is improper "post hoc" analysis, as Dr. Bernard Siskin testified. Furthermore, Rives did not provide independent data with respect to 1980. He combined results for 1978 and 1980. But these events are not statistically independent, and it was logically incorrect to have done so. (Tr. A. 90–96; PX–26).

31. *See* PX–25. This exhibit also includes tables which exclude the "short term DALs" from the administrative experience group. The exclusion does not alter the statistical significance of the result. Table 11, PX–26 shows a statistically significant correlation between administrative experience and promotion for 1978 and 1980 combined. Because the two years involve many of the same individuals, it is statistically invalid to combine them in this way, and it is not strongly probative.

to fare better because of their greater day-to-day familiarity with fireground command operations. Because, on average, minorities scored better on the oral problem than did whites, however, I do not find plaintiffs' explanation probative on the ultimate issue which is the link between promotion and race.[32] If experience was of some benefit on this component, it still did not cause whites to do better than minorities.

### b. *The 1980 test.*

The correlation between "administrative" experience and scores on the ATA portion of the 1980 test appears to be very close.[33] Although the Officers Manual (PX–10), which contained samples of each of the forms used on the ATA was available in every stationhouse and firefighters had ample opportunity to study the manual before the 1980 test, I accept plaintiffs' contention that day-to-day experience with these forms was of some benefit to BCAs, DALs, and firefighters assigned to D&S and FM. In my view, however, this does not completely account for the observed difference in score because, as discussed further below, the firefighters selected for these posts would be expected to have above average aptitude for administrative duties.

While I conclude that "administrative experience" is likely to have helped to some degree on the ATA portion of the 1980 examination, I find that plaintiffs have not answered the most crucial question: did the distribution of experience within the Bureau before the 1980 test cause a disparate racial impact of the examination as a whole. On the oral portion of the exam, which carried a sixty percent weight, whites averaged 6.37 points, while blacks and hispanics earned an average of 7.08. This difference offset any disparate impact resulting from the ATA. Altogether, the statistical evidence shows that those with "administrative experience" did better on the 1980 test, on average, than those without, but that minorities also did better on average than whites. *See* page 854, *supra.* Plaintiffs' evidence, therefore, fails to establish a causal link between experience and promotion.

### 5. *Other relevant evidence.*

There are additional reasons to reject plaintiffs' interpretation of the statistical evidence. First, other data relating to experience in one of the four "administrative" positions did not confirm that such experience was beneficial. One would expect that if experience in those positions were favored, those with more such experience would do better on the tests than those with less; this was not the case. DX–6. Although there are reasons for this which are consistent with plaintiffs' theory,[34] there is simply no reason to adopt these explanations over those advanced by the defendants.

Second, all of the minority firefighters who took the 1978 and 1980 tests had experience as TALs, as did most of the whites. In fact, minorities had more of such experi-

---

**32.** BCAs and DALs did score higher on the 1978 oral problem than those without such experience. But this difference was not statistically significant at anything approaching the 5% level. The difference was less than one standard deviation. A comparison of promotion rates also reflects a difference which is not statistically significant.

**33.** Plaintiffs did not offer any evidence on the ATA portion of the test alone, recognizing that courts have been reluctant to award relief on the basis of subcomponents of a selection process. As then-District Judge Newman wrote in *Brown v. New Haven Civil Service Board,* 474 F.Supp. 1256, 1262 (D.Ct.1979), to "examine each component of an entire application process launches a court on a course that has no

boundaries and no clear end." *See also, Friend v. Leidinger,* 588 F.2d 61, 66 (4th Cir. 1978); *Smith v. Troyan,* 520 F.2d 492, 498 (6th Cir. 1975); *Kirkland v. Dept. of Corr. Services,* 520 F.2d 420, 425 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). Nor was the ATA a pass-fail barrier to completion of the selection process. *See Teal v. Connecticut,* 645 F.2d 133, 139 (2d Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 89, 70 L.Ed.2d 82 (1981).

**34.** In rebuttal Dr. Rives theorized that the "learning curve" for the jobs may peak after a few months of experience. This does not explain, however, the apparent decline in scores once past this peak. *See* PX–27.

ence than white firefighters, on average.[35] While in some contexts the value of short term TAL service may be less than long term DAL service, in the context of the 1978 exam, I think it unlikely that any difference was a substantial factor. If it was an advantage on the ATA portion in 1980, it was not one which led to disparate impact on that test as a whole. *See* page 857, *supra.*

Finally, and most importantly, it must be realized that the alleged causal connection between the experience gained in "administrative" jobs and superior test performance is only one possible explanation for the statistical correlation upon which plaintiffs rely. The statistical correlation between holding certain jobs before taking a promotional test and higher test scores means only that there is a difference in the average ability, with respect to the characteristics the test measures, between two groups. One explanation for this difference is experience acquired in those jobs. The other, and the one I find more credible, is that the process for selecting people to serve in these jobs, even if tainted by racial bias, has selected a group of people who, on average, are likely to perform better on a lieutenant's promotional exam than the group of test-takers as a whole, on average. As one would expect, if for no other reason than the decisionmaker's self-interest, the officers responsible for selecting BCAs, Data and Statistics, and Fire Marshal's Office, in addition to considering "compatability" also look for firefighters with ambition, initiative, and administrative ability. These are all characteristics one would also desire, and test for, in a lieutenant.

This, of course, does not mean that minority firefighters lacked such ability or that those chosen were the most qualified; many were not. Nor does it mean that the selection procedures which effectively excluded minorities until 1980 were justified.

It means only that a valid analysis of the statistical data must take into account the fact that to the extent the administrative job selection process identifies the same abilities selected by the promotional exams, those chosen for administrative jobs can be expected to perform better on promotional tests on average [36] without regard to the value of the experience of service in those jobs.

The City's expert, Dr. Bernard Siskin, testified that DALs would be expected to have above average "test taking ability". (Tr. D. 105–106). That is to say, the 1974 exam which was used to select the DALs identified a group which was likely to do better in testing situations, on average, than firefighters as a group. Dr. Rives conceded that the data was consistent with the hypothesis that the promotional examinations and the criteria used to select DALs, BCAs and assignments to Data and Statistics and the Fire Marshal's Office were similar, as well as the hypothesis that experience was a "leg up" on a promotional test. Since I find the former hypothesis more credible, in view of all the evidence presented, I do not accept the logic of plaintiffs' statistical case.

D. *Instances Of Racial Antagonism.*

It is unfortunate, but true, that racial prejudice has not been wholly eliminated from the life of the Bureau of Fire. Plaintiffs' evidence of this fact is relevant, in this case, however, only to the extent it tends to show that those responsible for developing and administering the 1978 and 1980 selection procedures for promotion may have been influenced by racial bias. By so noting, I do not mean to belittle the significance of the incidents presented to the Court for the individuals involved. The issue before the Court, however, is whether the challenged promotion procedures had a disparate impact on minorities.

---

**35.** From January 1977 to September 30, 1978 blacks averaged 37.4 TAL shifts, whites averaged 18.7 over the same period. *See also* note 13, *supra.*

**36.** This should not be read to imply that the selection procedures were "validated". It simply means that the statistical correlation in success rates reflects some correlation in the content of the selection process, valid or invalid.

The testimony relating to individual episodes of racial antagonism does not implicate any of those involved with the development of the 1978 and 1980 tests. Specifically, in addition to the fact that neither the Chief nor any of his deputies were participants in any of these incidents, the record fails to show that they have tolerated or condoned racism, or failed to take disciplinary action when appropriate. While plaintiffs contend that the administration's response to some of these episodes has been inadequate, the record provides no basis for comparing the sanctions imposed upon white firefighters for their part in racial incidents with penalties in other cases and, in the absence of such evidence, I am unwilling to say that the punishments imposed were so light as to support an inference that the administration is not seriously committed to the eradication of racial bias in the Bureau.

Plaintiffs, to their credit, acknowledge that substantial progress has been made in the Bureau since Chief Donohue became Chief. While they believe that much of this progress has been attributable to the pendency of this action, I do not understand plaintiffs to challenge Chief Donohue's good faith when he described his wish for a greater representation of minorities in the officer corps. Based on his testimony and his record both before and since becoming Chief, I am persuaded of Chief Donohue's commitment to racial equality in the Bureau in general and to fair and unbiased promotion procedures in particular.

Given the change of administration prior to the development of the 1978 exam and the commitment of that new administration to equal opportunity, neither the acknowledged history of racial discrimination in the Bureau of Fire nor the vestiges thereof leads me to infer that the 1978 or 1980 promotional procedures had a disparate impact on minorities.

### E. Conclusion.

The plaintiffs' case rests on four pillars which do not individually or collectively support their conclusion that the 1978 and 1980 tests had a disparate racial impact.[37]

### III. INTENT.

Plaintiffs' claims under Sections 1981, 1983 and the "disparate treatment" branch of Title VII depend upon proof of intentional discrimination by race. Since plaintiffs have failed to show that they have suffered a disparate racial impact as a result of the 1978 or 1980 promotional exams, the "foreseeability" of this impact is simply not an issue. In any event, the correlation between administrative job assignments in the years prior to the 1978 and 1980 tests and promotions is not one which would have been evident to someone designing those tests.

The remaining testimonial evidence of intentional discrimination, as stated in Section II(D) above, is insubstantial. It does not show that discrimination was the "regular rather than the unusual practice." *Int'l. Brotherhood of Teamsters, supra,* 431 U.S. at 336, 97 S.Ct. at 1855.

### IV. THE THREE YEAR RULE.

The Wilmington Bureau of Fire requires all firefighters to serve three years in grade before they become eligible to take a promotional exam. Because the Bureau has hired more minority firefighters in recent years than it has in the past, this eligibility standard tends to exclude minorities out of proportion to their numbers in the Bureau as a whole.

■ Plaintiffs' challenge to this aspect of the promotional process poses several legal and factual issues: (1) is the three year rule "severable" from the other components of testing procedures for purposes of Title VII disparate impact analysis? *See Brown v. New Haven Civil Service Board,* 474 F.Supp. 1256, 1262 (D.Conn.1979); *Kirkland*

---

**37.** Since the plaintiffs failed to prove disparate impact, *i.e.* failed to prove a *prima facie* case, the defendants' failure to show that either test

was "manifestly related" to the job of fire lieutenant is not legally significant. *See* page 850 *supra.*

*v. Dept. of Correctional Services,* 520 F.2d 420, 425 (3d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). *Teal v. Connecticut,* 645 F.2d 133 (2d Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 89, 70 L.Ed.2d 82 (1981) (pass-fail barrier is severable even if no disparate impact on overall selection); *Smith v. Troyan,* 520 F.2d 492, 498 (6th Cir. 1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); *Friend v. Leidinger,* 588 F.2d 61, 66 (4th Cir. 1978); *Rule of Ass'n of Bridge Workers,* 568 F.2d 558, note 10 at 565 (8th Cir. 1978); (2) Is the three year rule a "bona fide seniority system" under 42 U.S.C. § 2000e–2(h)? *See Int'l. Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 353, 97 S.Ct. at 1863. *California Brewers Association v. Bryant,* 444 U.S. 598, 605, 100 S.Ct. 814, 819, 63 L.Ed.2d 55 (1980); and (3) Is the three year rule manifestly job related? Because the named plaintiffs have no standing to raise these issues, I will not attempt to resolve them here.

All of the named plaintiffs were eligible for and took the 1978 and 1980 promotional examinations; they suffered no adverse effects from the three year eligibility rule. Thus, with respect to the three individual plaintiffs "there is no causal connection between the claimed injury [loss of promotion] and the challenged conduct [the three year rule]." *Howard v. New Jersey Dept. of Civil Service,* 667 F.2d 1099 at 1101 (3d Cir. 1981). Indeed, the rule was to their advantage since it reduced competition for the limited number of available promotion slots.

**38.** This is, accordingly, not a case where a representative party is properly certified and, for some reason, thereafter loses his "stake" in the controversy. *See Franks v. Bowman Transportation Company,* 424 U.S. 747, 752–54, 96 S.Ct. 1251, 1258–59, 47 L.Ed.2d 444 (1976).

**39.** These short term firefighters might, under other circumstances, have been certified as a subclass for the purpose of litigating the claim regarding the three year rule, but none of the named plaintiffs could have represented such a subclass. See F.R.C.P. 23(c)(4)(B).

■ The plaintiffs correctly point out that they have been certified to represent a class consisting of all present and future minority members of the Bureau of Fire and that there are members of that class which do have standing to challenge the three year eligibility rule. It does not follow, however, that I am free to adjudicate the validity of the rule. While my opinion on certification is, I confess, not a model of clarity, those minority firefighters who were not eligible under the rule were included in the class solely on the ground that defendants' allegedly "discriminatory work assignments" and testing techniques, if not enjoined, would adversely affect them "when they ultimately do participate" in the future. Memo. Op. p. 4. *See* F.R.C.P. 23(c)(4). If that opinion be read to certify plaintiffs to represent short term minority firefighters in a challenge to the three year rule, however, that certification was improvidently granted and must be revoked.[38] With respect to that claim, the interests of the named plaintiffs clearly conflicts with the interests of minority firefighters with less than three years service in 1978 and 1980.[39] Before the Court may bind absent persons to its judgment, it must be sure that those who purport to represent them have an interest in the relief sought which will vouch for the adequacy of the representation. *Rodriguez v. East Texas Motor Freight,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977) (a class representative must "possess the same interest and suffer the same injury"). The requisite assurance is absent in this case with respect to the claim concerning the three year rule and, accordingly, I decline to adjudicate that claim.[40]

**40.** In supplemental briefing on this issue, the plaintiffs rely heavily on the "across the board" theory of class representation, which holds that an individual plaintiff may attack any and all policies which allegedly arise from the same discriminatory animus. The courts have divided on this issue since *Rodriguez, supra, see* Schlei & Grossman (Supp.1979) at 276–77. I read the Third Circuit's opinion in *Howard, supra,* however to cast its lot with those courts which have rejected this broad concept of standing. *See also, Bronze Shields, Inc. v. New Jersey Dept. of Civil Service,* 667 F.2d 1074 at

## V. CONCLUSION.

For the reasons previously stated, I will enter judgment for defendants and the third party defendant.[41]

---

1080 Slip Op. notes 11 and 12 at 10 (3d Cir. 1981).

41. The City joined the Union as a third party defendant on the theory that the Union was partially responsible for the practices challenged in this case. Plainly, if the City is not liable, neither is the Union.